CALUMET SERVICE COMPANY, Respondent, vs. CITY OF CHIL-
TON, Appellant.

*January 31—February 20, 1912.*

TRIAL. (1–5) *Findings of fact.* PUBLIC UTILITIES. (6–11) *Purpose of law: Basic idea: Construction: Classification of privileges: Single control.* (12, 13) *What is a "public utility."* (14) *Service "directly or indirectly to or for the public."* (15–18) *Franchise: Indeterminate permit: Scope and limitations.* (19–21) *Capacity to acquire permit: Corporate power: Enlargement by implication: Exchange of existing franchises.* (22–27) *Exclusive rights: "Monopoly:" Right to serve city: Excusable interruptions of service: Power of city to establish competing plant: Conditions precedent: Certificate of public convenience and necessity.* (29, 30) *Equity: Injunction.* (28) *Assignability of property and privilege.*

Equitable action closed by findings in some 14,000 words. An assignable privilege was granted by a city to do public utility service therein for public and domestic purposes with usual incidental rights. The privilege was exclusive as to city service for a time and preferential thereafter and exclusive for a longer term as to domestic service. The business was established. The entirety was vested in plaintiff before commencement of the action. There were four corporation owners in the chain of title and questions as to some respecting corporate power,—particularly as to the second corporation which, in due form, acquired an indeterminate permit for the old privilege

under ch. 499, Laws of 1907. The exclusive city term had expired but service was continuing. Thereafter the city sought to enforce conditions of the old privilege; to invade the field claimed to be exclusive, incident to the permit; to establish a business to that end; and incur indebtedness therefor without complying with the public utility law, claiming rights under statutes antedating such law. The impeachment of plaintiff's claimed rights caused it pecuniary loss and prejudiced it in performance of its duties, and made further loss imminent. Except for disturbance thus caused, plaintiff and its predecessors were willing and competent, substantially all the time, to perform their public utility duties.

The decision involves these points:

1. Sec. 2863 of the Code should be reasonably followed below, in the circumstances stated therein, by a decision stating "separately all the facts found."

2. "Facts" means pleadable facts.

3. "Separately" refers to pleadable or pleaded facts, each being required to be covered by a finding confined thereto.

4. A decision under sec. 2863 of the Code should contain one finding for each actually, or in effect, pleaded fact, upon which the parties depend, phrased in concise, clear, judicial language, avoiding repetition, elaboration, discussion, and evidence or evidentiary facts or circumstances.

5. Compliance with the Code, as indicated, is to be striven for, to minimize unnecessary judicial labor, raise the grade of it, increase judicial efficiency, and promote economy and certainty in the administration of justice.

6. The sole purpose of ch. 499, Laws of 1907 (secs. 1797m—1 to 1797m—108, Stats.), was to promote general welfare by affording public utility service directly and indirectly to and for the public, of the highest practicable efficiency, at the lowest practicable rates under the circumstances of each particular case, having regard for existing proprietary interests and reasonable opportunity for municipal ownership on a basis of justice to existing proprietors.

7. Ambiguous parts, if there be any, of the public utility law, should be read in the most reasonably favorable light to effect the manifest purpose, comprehensive definitions of the law being adhered to regardless of technical meaning of terms.

8. The basic idea of the public utility law is stated in sec. 1797m—3, thus: "Every public utility is required to furnish reasonably adequate service and facilities," etc. "The charge . . . shall be reasonable and just, and every unjust or unreasonable charge . . . is prohibited and declared unlawful."

9. The duty and responsibility indicated in No. 8 applies to municipalities engaged in public utility business.

10. Those parts of the law, other than the one declaring the purpose, are auxiliary thereto,—a prescription of means for effecting the end aimed at.

11. The dominant means was classification of existing and prospective privileges to do public utility business, making the latter indeterminate and conditionally exclusive and inducing each owner of a former to join the latter as to the scope of the then existing privileges, by acquiring an indeterminate permit; thus gathering all into a single class referable directly to a single source for existence and to a single standard for a measure of rights, duties, responsibilities, and advantages, *i. e.* the public utility law, and a single control,—the railroad commission, subject to the conditions and limitations of such law.

12. For detail means, by sec. 1797*m*—1, the person or persons, natural or artificial, in touch with the public in connection with public utility service, whether as owner, operator, manager, or controller, or private or *quasi*-public entity, is a public utility, the physical and other things in use, public utility property, and the subject of the service,—a utility,—the term "public utility" being used to characterize the physical situation and condition as to immediate authority over it.

13. One, natural or artificial, public or private, municipal or otherwise, answering to the calls of sec. 1797*m*—1 of the Statutes, viewing the descriptive words in the broadest reasonable sense, and disregarding technical capacity to hold and enjoy *in præsenti*, was for regulation and control to effect the end sought, given the status indicated, subject to prescribed duties and responsibilities, with corresponding advantages, all subject to the single control under the single standard.

14. "Directly or indirectly to or for the public," includes service whether to a municipality or its inhabitants, or both, or by a municipality for itself or its inhabitants.

15. A privilege within the scope of No. 14, whether a license, permit, or, technically, a franchise, is the latter in the statutory sense.

16. An indeterminate permit is a perpetual exclusive privilege within the scope of the grant, subject to the code of conditions and limitations.

17. An indeterminate permit duly received for an old privilege is of the same scope as the latter as to the privilege feature, freed from all considerations, limitations, reservations, and control incidents prescribed by the municipality as a state agency, including the right of repeal, if any reserved, but subject to the conditions and limitations of the public utility law.

18. The law contemplates all relations created by a munici-

pality between it and the grantee of a franchise and inhering therein as being the mutual creation of the state, through its agent, and the grantee, and subject to termination by the same mutuality.

19. The essentials of "public utility" to acquire an indeterminate permit for an old privilege, are referable to sec. 1797m—1 of the Statutes; that of corporate status is satisfied by corporate existence *de jure* or *de facto*, referable to Wisconsin written law; that of existing privilege, by ownership of any right from the municipality, whether resting in grant, permit, license, or franchise in the technical sense, either being a statutory franchise; and that of operating under the privilege *in præsenti*, by services offered and affordable, and willingness and ability in that regard, except for reasonable and excusable cessations not involving any purpose to abandon.

20. Want of corporate power referable to defect in organization and not militating against existence *de facto*, or referable to limitations of corporate purpose specified in the organic articles, which under ordinary circumstances are only subject to be inquired into by the state, directly, does not affect capacity to acquire an indeterminate permit.

21. The general grant of power under the circumstances specified in sec. 1797m—77 of the Statutes, to acquire an indeterminate permit, by necessary implication was intended to enlarge, if necessary, corporate powers, enabling the organization to legitimately deal with the state in the exchange of equivalents,—to surrender its rights, whatever they may be, and take and enjoy the one offered in lieu thereof.

22. The privilege, conditional and temporary or otherwise, under a grant through municipal agency, to supply a municipality with a particular utility, using the public places to that end, in case of exchange thereof for the indeterminate permit of the statute, retains in the substituted franchise the privilege features, with the added element of perpetuity and the element of exclusiveness, freed from all prior conditions and limitations, but subject to those of the public utility law.

23. An indeterminate permit as in No. 22, within its scope, as to the municipality for its own service or service by it to its inhabitants, or service to others by any other public utility, is characterized by the elements of perpetuity and exclusiveness, mentioned.

24. The purpose of the law was to give the holder of an indeterminate permit, as in Nos. 22 and 23, as regards the conditions existing at the time of its origin, a qualified monopoly within the scope of the privilege, subject to the conditions and

limitations of the public utility law,—the term "monopoly" not being used in its common-law sense, except as to exclusiveness, but being characterized by purpose to promote public welfare, by a return consideration and by not being of common right, instead of being otherwise but for the grant and being for private gain.

25. Given a field, occupied under sec. 1797$m$—77 of the Statutes, for service to a municipality and its inhabitants, and the city will be incompetent to interfere except upon obtaining from the governing commission a certificate of public convenience and necessity, evidencing that reasonably efficient service at. just and reasonable rates is not obtainable under the existing privilege, or by otherwise complying with the public utility law.

26. The statutory conditions which preceded the public utility law, empowering a municipality to construct or own public utility property for municipal or general use within the municipality and incur indebtedness therefor, were so superseded by such law as to render the latter paramount and the former subsidiary, making such statutory conditions usable only conditioned upon municipal compliance with such law.

27. Given a public utility corporation operating in a municipality under an indeterminate permit notwithstanding reasonable and excusable interruptions of service, and all proceedings of the city to construct a rival plant and do a rival business without first complying with the conditions of the public utility law, are void.

28. A public utility property and privilege constitute an entirety, partaking of the character of the privilege, and are of proprietary nature, and assignable the same as property commonly, in the absence of any express prohibition.

29. Given a situation of a public utility property operating under an indeterminate permit received in exchange for a prior privilege and the municipality, nevertheless, insisting upon conditions and limitations of the old grant, and proceeding accordingly, assuming to possess authority to do so, and invading the field reserved to the holder of the indeterminate permit without satisfying the conditions precedent in that regard, to the irreparable injury of the existing public utility,—and a situation exists for equitable interference and relief adequate to the case.

30. In the circumstances stated in No. 29, if the illegitimate claim of right extends to that of invading the reserved preferential right to do the municipal lighting, the equitable relief should quiet the right of the existing public utility against.

such wrong claim, and afford injunctional prevention of its being acted upon.

[Syllabus by MARSHALL, J.]

31. Language used in the opinion in *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 417,—speaking of a privilege, such as was grantable to an individual as well as to a corporation, as a "corporate state franchise,"—corrected.

32. *Per* TIMLIN, J. The indeterminate permit obtained upon surrender of a pre-existing-franchise is not necessarily a *perpetual* permit subject only to the conditions presently prescribed in the public utility law. That law is subject to repeal or amendment like other statutes.

APPEAL from a judgment of the circuit court for Portage county: CHAS. M. WEBB, Circuit Judge. *Affirmed.*

Action for equitable relief. Its nature as disclosed by pleadings and evidence and embodied in the findings is thus summarized:

### I.

Defendant city, December 7, 1897, granted an assignable franchise, license, or permit to one Bink, who accepted the same, to erect, maintain, and operate in such city an electric lighting plant to supply light, heat, and power for public and private use for fifteen years, using the city public places, as usual, to that end, with the sole right to do the public lighting therein for ten years and preferential consideration in that regard thereafter, and a right to franchise extensions in respect thereto, reserving the privilege to purchase the property in a manner specified, and right of repeal, in case of failure to furnish electricity as provided during thirty consecutive days, or of wilful violation of any requirement of the franchise or to properly carry on the contemplated business.

### II.

Bink installed the plant and established the contemplated business, and thereafter, by him and his associates and successors in interest,—1st, Wisconsin Storage & Electric Company, 2d, Wisconsin Electric Service Company, 3d, Public Service Company, and 4th, plaintiff,—it was maintained and

all duties incident to said franchise, or the substitute therefor hereafter mentioned, down to the time of the trial, were fully performed,—except as prevented by defendant's wrongful conduct,—and the public lighting was paid for, except $396 for the last quarter of the ten-year period, ending December 14, 1907.

### III.

Each of said companies was, and plaintiff is, a duly organized corporation under the laws of the state of Wisconsin; the first had due capacity to, and did, acquire as owner, the said franchise, the second, likewise, as owner, acquired it and the indeterminate permit duly granted by the state in lieu thereof, as hereinafter stated, which permit and all property in use and for use in connection therewith, including the public utility business privileged thereby, in due course, passed to the third corporation and subsequently to the fourth, each being duly authorized thereto, and was possessed by the latter with such indeterminate permit at the time of the commencement of this action.

### IV.

During the second ownership, the company duly incumbered the franchise and property for $20,000, issuing bonds which are outstanding and were to defendant's knowledge, during the time material to this case.

### V.

December 21, 1907, during the third ownership the company surrendered the Bink franchise under ch. 499, Laws of 1907, receiving from the state, in lieu thereof, a perpetual and exclusive privilege,—called an indeterminate permit,— to do the things privileged before, subject to the conditions and limitations of such chapter.

### VI.

During the latter part of the ten-year period of the Bink franchise, the owner became financially weak and did not efficiently maintain the plant and give altogether satisfactory

service, though largely, or wholly, because of defendant's fault. The latter, ostensibly because of such poor service, refused to deal with such owner; whereupon the latter offered to comply fully with the franchise, or sell to the city, or meet any competition, but said city refused all advances in that regard and invoked the railroad commission, December 23, 1907, to grant a certificate of public convenience and necessity, authorizing another public utility in the city. The proceedings were dismissed because of the existing public utility and defendant's failure to proceed in reference thereto as contemplated by the public utility law.

## VII.

Notwithstanding the refusal to deal with plaintiff's predecessor, under the public utility law or the old franchise, public and private lighting was continued till January 17, 1908, though payment for public service and recognition of there being any existing privilege in the matter were refused. Hostility by the city; its efforts to have the claimed privilege superseded; as indicated, or by proceedings by the attorney general, destroyed the then company's credit, caused its legitimate business to drop and forced it to temporarily suspend. However, it continued all reasonable endeavors to make some sort of arrangement with the city and failed in that regard.

## VIII.

March 17, 1908, in the circumstances stated, the city council of defendant submitted the matter of building a lighting plant to the electors; resulting in 190 votes for and 92 against.

## IX.,

May 30th thereafter, such council voted to issue bonds for a plant; the intent throughout being to displace the old one both as to public and private lighting.

## X.

Such action was under secs. 926—128 to 926—131, inclusive, of the Statutes, which did not warrant the same, but, if pursued, would inflict upon plaintiff irreparable loss in per-

manently destroying its business, lessening the value of its indeterminate permit, injuring its credit, and depreciating the security of its bonds, besides injuring it as a taxpayer of the city.

## XI.

Such conduct created a cloud on plaintiff's public utility property and business, preventing it from efficiently performing its duties, causing it to lose old, and preventing it from acquiring new, patronage, and creating such prejudice among the people as to lead to actual injury to its street lights and other property.

## XII.

Each owner in the chain of title to the existing franchise has been ready and willing to perform its public utility duties, and any failure is attributable to the wrongful conduct stated; furthermore, plaintiff is now able, willing, and competent to so perform; its property is in full operation, neither it nor its predecessors inexcusably suspended; it was organized in the interests of the bondholders whose money is invested in the property, and it incurred large expenses for the purpose of meeting all requirements as a public utility corporation and was encouraged thereto by defendant as hereafter stated.

## XIII.

The first real default in said bonds was January 1, 1908. The bondholders learned of the suspension March 6th thereafter. Soon they were encouraged by the city authorities to believe that, if they obtained control, amicable relations with the public could be resumed. Thereupon they acquired such control, including the public privilege, vesting all in plaintiff, acting in the matter under competent legal advice for the best interests of all concerned, and expending considerable sums of new capital to create a basis for adjustment of all differences and fully perform the duties incident to the public privilege.

## XIV.

Plaintiff's predecessor and the bondholders were notified that, August 8, 1908, the city council of defendant would act on an ordinance repealing the Bink franchise for specified violations. Before then such bondholders, to protect their interests and save the public utility property, caused plaintiff to be duly organized and to acquire the entire property with the indeterminate permit; including such rights as might exist under the Bink franchise, and the same was acquired accordingly; each of the preceding corporations conveying to it. Before said date the city was notified thereof and that plaintiff was able to and would, at once, enter upon full performance of its public utility duties, and that it was ready to enter into any fair arrangement with the city. Nevertheless, the city council adopted the repealing ordinance.

## XV.

Jurisdiction as to repeal was superseded by the new permit; and, moreover, the city was estopped from exercising any right of repeal by its aforementioned conduct. Nevertheless, its action constitutes a cloud on plaintiff's public utility rights and property, damaging the value thereof, destroying or undermining its credit, and preventing it from acquiring the business status essential to existence and capacity for its public utility duties. Full publication of the ordinance would create such further cloud, in the whole, causing plaintiff irreparable loss.

## XVI.

Plaintiff exercised due care to put such property in commission and perform the duties incident to its privilege. It fully resumed operations September 17, 1908, and has ever since complied with the law. It diligently commenced this action, securing an interim injunction to prevent the repealing ordinance from being effective, but was not able to use such injunction till August 21, 1908, at 5 o'clock p. m. Pub-

lication occurred under date of August 22, 1908, though pa-
pers were being printed at the time of service and some had
been deposited in the postoffice.

From such situation as to facts the court concluded that
plaintiff was a public utility corporation owning an indeter-
minate permit under ch. 499, Laws of 1907, entitling it to
the exclusive privilege, subject to the conditions and limita-
tions of such law, to maintain, add to, and operate an electric
plant in the defendant city for the purpose of producing,
transmitting, delivering, or furnishing heat, light, or power,
either directly or indirectly, to or for the public in said city;
that such privilege, till superseded in the manner provided
in such law, was exclusive respecting city as well as other
service; that all proceedings by defendant inconsistent there-
with were void; and that plaintiff was entitled to judgment
accordingly, including injunctional features appropriate to
the case, and to recover costs.

Judgment was rendered accordingly, exceptions being
saved raising the questions discussed in the opinion.

For the appellant there was a brief signed by *L. P. Fox,*
city attorney, and *P. H. Martin* and *James Kirwan,* of coun-
sel; a supplemental brief signed by *P. H. Martin,* of counsel;
and oral argument by *Mr. Martin* and *Mr. Fox.*

For the respondent there was a brief by *Thompsons, Pink-
erton & Jackson,* attorneys, and *J. E. McMullen,* of counsel,
and oral argument by *W. D. Thompson* and *C. D. Jackson.*

Briefs were also filed upon the question of the validity of
ch. 217, Laws of 1911, signed by *H. O. Fairchild* and by
*Victor I. Minahan,* as *amici curiæ.*

MARSHALL, J.    In the foregoing summary, covering a few
pages, we have stated, it is thought, the essentials, from any
viewpoint, of the fifty-four-page finding required to be ex-
amined in order to discover just what was decided in this
case as a basis for the judgment.    A recast of the findings

seemed necessary. It has been accomplished by elimination of over nine tenths of the words originally used. The vital matters could, by more study, be covered by still less. It would be a valuable change in administration, one tending to successfully meet some criticism of the law where it is free from fault, the trouble being with its administration, if more attention could be efficiently given to closing an equity case by concise findings of fact, covering singly and concisely the material pleaded, or pleadable, and proved or admitted grounds for redress or defense, avoiding repetition, elaboration, discussion, and all evidentiary matters even to mere evidentiary facts. Such is what the Code calls for. To such its letter and spirit restrict the findings. Why not conform thereto, especially since the labor, and the expense, both public and private, are thereby minimized and the case would be, as a rule, more easily understood, the initial judgment be more liable than otherwise to be securely grounded; in short, since there are many and very valuable advantages, both public and private, in the course suggested and no disadvantages. The court has spoken several times, quite emphatically, on this subject, and not without effect, though with less, as the case in hand and others which have come to this court indicate, than we had hoped for. This is said with more of desire to lighten the labor of the overworked trial judge than thought of criticising.

The overcaution which often results in such excessively long findings as we have had to deal with here, greatly adds to the necessary labor of trial courts and this court without corresponding benefits,—generally the opposite. Elimination of all which is unnecessary, so far as practicable, and concentration of energy upon essentials, will minimize work while raising the grade of it, and greatly add to efficiency of each unit in the field of trial administration. Without saying more we counsel attention to *Farmer v. St. Croix P. Co.* 117 Wis. 76, 93 N. W. 830; *McKenzie v. Haines,* 123 Wis.

557, 102 N. W. 33; *McDougald v. New Richmond R. M. Co.* 125 Wis. 121, 103 N. W. 244; *Fanning v. Murphy,* 126 Wis. 538, 105 N. W. 1056; *Neacy v. Milwaukee Co.* 144 Wis. 210, 222, 128 N. W. 1063.

The briefs of counsel for appellant cover a wide range of subjects. It includes many which, in the judgment here, are not sufficiently material to warrant special treatment. They are all interesting subjects for study. Each was exhaustively and technically treated by the eminent counsel. If the result of the case, from any viewpoint involving doubt, depended upon a discussion of them in detail the mere labor of it would not cause hesitation to meet the situation.

The case is one of great importance as regards the few vital questions. It is especially so as to the main contention,— the real key of the controversy between the parties. It is so important to the vast public interests involved in the public utility field, which the legislature evidently intended to encompass by ch. 499, Laws of 1907 (secs. 1797m—1 to 1797m—108),—and, so far, it has been found to have accomplished the task with such distinguished completeness that the enactment stands as a most consummate effort of legislative wisdom and a model for similar efforts elsewhere,— it is thought that any uncertainty left in the law by the previous judicial tests which have been applied to it, can best be eliminated by confining this opinion and discussion to the particular point, or points, of uncertainty which constitute the real root of this litigation, turning aside all mere technical questions and makeweights. Thus restricted the opinion is liable to be of unusual length.

Are those of the findings of fact which call into activity the questions of law upon which the legitimacy of the judgment complained of depends, sustained by the evidence? That is the first grand division of the subject to be dealt with. If there are other findings not material from the suggested viewpoint they may well, and will, be passed without special men-

tion. Thus brushing aside the inconsequential, we come first to the question of whether respondent's remote grantor, the Wisconsin Electric Company, acquired an indeterminate permit under the public utility law. The court so found as a fact, and the finding was duly excepted to. In a sense, it was a mixed matter of law and fact, but so far partook of the cast of the latter that it was properly pleadable as a fact and thus passed upon.

Subsidiary to the foregoing major proposition, is the question of whether the Electric Company, at the time of the surrender proceedings, December 21, 1907, satisfied the calls of sec. 1797m—1 of the public utility law for a "corporation . . . that . . . may own, operate, manage or control any plant or equipment or any part of a plant or equipment within the state, . . . for the production, transmission, delivery or furnishing of heat, light, . . . or power either directly or indirectly to or for the public," and at the same time satisfied the calls of sec. 1797m—77 of such law for a "public utility, being . . . a corporation duly organized under the laws of the state of Wisconsin, operating under an existing license, permit or franchise."

There is no question but that the Electric Company complied with all requirements of the surrender feature of the law found in the last mentioned section, or but that if, at the time of the surrender, it had the requisite status to satisfy the calls aforesaid, it received by operation of law, in consideration of that which it surrendered, an indeterminate permit of the character mentioned in the public utility act and offered to any corporation possessing such status in exchange for its existing privilege. So we turn to the question of competency.

It is useless to discuss at any great length, whether the Electric Company satisfied the full scope of sec. 1797m—1, since it is clear beyond room for fair controversy, that it responded thereto sufficiently. The comprehensive language, "own, operate, manage or control any plant or equipment or

any part of a plant or equipment within the state, . . . for the production, transmission, delivery or furnishing of heat, light, . . . or power either directly or indirectly to or for the public," was plainly designed to cover every conceivable situation of the existence of an industry of the nature mentioned. No room was left for controversies over technical ownership or capacity to own. The purpose was to encompass the physical situation,—to deal with the condition whatever it might be, and the person, natural or artificial, whatever might be the particular relation of the person, or persons, natural or artificial, to the physical situation or condition, whether that of owner, operator, manager or controller, and give thereto the status of a public utility. The Electric Company obviously was located somewhere within this broad field. Therefore, it was a public utility,—one essential to capacity to acquire an indeterminate permit under sec. 1797m—77.

Now regardless of the exact scope of the corporate powers of the Electric Company it clearly was a duly organized corporation under the laws of this state and so had the second essential to acquire the permit. While there seems to be no efficient ground for impeaching the original scope of the organization, a point perhaps not essential to this case, there is no ground which can be urged collaterally, and none that could be by defendant in any event, since there is no question but that it was at least a corporation *de facto*. Moreover, the city, both in its own behalf and as a state agency, recognized and dealt with it as a corporation for much over a year after the company took over the property from its predecessor. In proceedings before the railroad commission the city insisted by sworn petition that the company was a duly organized domestic corporation; that it became owner of the Bink franchise; that it had duly surrendered the same; and that the city had refused to deal with it under the public utility law for reasons suggested. 2 Railroad Comm. Rep. 326.

Notwithstanding the foregoing, which we only refer to as an additional ground for the essential of efficient corporate status, the case might well be rested in respect to the matter upon what seems from the record quite plain, i. e. that there was no infirmity in the corporate organization or capacity in any event. But if it were otherwise as to the original scope of the corporate authority, the company possessed ample power because, by force of the public utility law, the corporate authority was automatically expanded, if necessary, to enable the company to receive the thing given to it for the one surrendered,—the one which it was operating under, regardless of any technical question as to its previous capacity, at the suit of the state, to so operate. No opportunity was left at this point for cavil or complication. If the corporation was operating, within the meaning of the law, under the privilege surrendered, and had a right, as against any other claimant, to make the surrender, that gave it corporate capacity to do so. The law, in holding out the consideration for the surrender and inviting acceptance thereof, by necessary implication afforded the company capacity to deal with the state in such invited exchange of equivalents. The paramount essential was that the company making the surrender should be a domestic corporation,—one referable to Wisconsin law for its existence and powers, thus possessing a status enabling the state to shape such powers, if necessary, so as to meet the necessities of the contemplated traffic in privileges,—a corporation amenable to Wisconsin jurisdiction to the fullest extent essential to enable the administrative commission to readily prevent abuse of the privilege granted and compel full performance of the duties incident to the grant.

Whether the Electric Company had a franchise, in the strict technical sense, granted by the city of *Chilton* to do public utility business therein, though we perceive no good reason why not, independently of any statutory definition, is of little moment. The legislature anticipated room for controversies over such matters and, *ex industria,* guarded against it. In

that respect the most consummate care was used in framing the law. The legislature did not rest the matter, as it might have done, by mere use of the term "franchise." The broad term was used instead, "license, permit or franchise,"—in short, any public privilege of any sort to do any kind of the service mentioned within the scope of the public utility law, followed by the term "franchise" as a synonym for the entirety. The company had the privilege granted to Bink. That is clear. The appellant confessed it in the proceedings before the commission, as we have seen. It was a privilege of some sort to do public utility business in the city of *Chilton,* covered by the broad phrasing repeatedly therein used, "license, permit or franchise," and in the more concise phrasing in sec. 1797m—77, referring to the broader one as an entirety for an antecedent "franchise." Here again note the legislative care to guard against prejudicial controversies over the subject dealt with. Observe that it was a situation and a condition in the entirety which the lawmaking power had in view. Plainly the purpose was not to leave any room for claiming that any part thereof was omitted by grounding the claim on technicality as to the meaning of words. In the popular, if not legal conception, and why not the latter is not perceived, a privilege to do anything, not a matter of common right but referable either directly or indirectly to sovereignty as the grantor, is a franchise. The legislature evidently had this conception in mind, yet thought it was synonymous with the legal meaning, but to remove all doubt used the words, as indicated, "license, permit or franchise," and "franchise," interchangeably. So the Electric Company had the third essential to competency to acquire an indeterminate permit.

Was the company, operating under its existing "license, permit or franchise" within the meaning of sec. 1797m—77 ? There seems to be no question about that. At the date of the surrender proceedings, December 21, 1907, the company was. furnishing electric current, both to and for the public for all

purposes. It continued to thus furnish till January 17, 1908, and till the defendant refused to deal with it under any circumstances, or to recognize it as having any rights under the public utility law, thus creating a condition rendering temporary suspension necessary to prevent loss, and excusable as the trial court decided. We will say, in passing, that the words "operating under," etc., in sec. 1797$m$—77, were doubtless used in the same sense as the words "in operation under" in sec. 1797$m$—74 which we shall speak of later. Enough has been said, at this point, to show that the Electric Company had the particular feature here discussed of capacity to surrender its existing permit and obtain a new one in lieu thereof.

So the findings are amply sustained that the Electric Company December 21, 1907, acquired an indeterminate permit. The surrender proceedings in form and substance were without infirmity; the company had all the essentials of capacity to make the exchange,—(a) It was a public utility; (b) It was a duly organized corporation under the laws of this state; (c) It had a "license, permit or franchise" to do public utility business in the city of *Chilton;* and (d) It was operating under such "license, permit or franchise."

The next subsidiary question is: What was the scope of the privilege? That is plainly ruled by the letter of the public utility law as analyzed in *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.* 145 Wis. 337, 129 N. W. 600, and *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530. It was a privilege emanating directly from the state to do the things theretofore privileged by it through the city as a state agency, freed from all conditions or limitations except those of the public utility law. This field was explored so fully in the *La Crosse Case* that the better way now, as it seems, is to refer thereto respecting matters therein settled instead of indulging in any lengthy rediscussion thereof.

No question is raised but that the Bink franchise privileged

the grantee to generate and convey electric current and dis-
tribute it in the city of *Chilton* to supply the city and its in-
habitants with light, heat, and power, and to use the public
places of the city and do the things usual to that end.    By
the terms of the privilege, it contemplated a means of supply-
ing electric current directly to the public by dealing with its
inhabitants in their individual capacities, all possessing the
common right to be served, and to the city,—the inhabitants
thereof in their corporate capacity.    That contemplated not
only supplying, as indicated, but having a supply or capacity
to supply from, to satisfy all needs within the corporate limits
of the municipality.    The privilege, as to the corporation,
was no less significant than as to the inhabitants, except as
regards the ten-year limitation of exclusiveness.    As to the
mere preferential element in serving the city in the public
utility field, there was no difference.

The Wisconsin Electric Company then was clothed with an
indeterminate permit of the full scope mentioned.    It mani-
festly included the privilege to do all things contemplated by
the terms "supply to the city or its inhabitants" found in the
original grant.    That it included supply to the city by the
grantee utilizing the current to do the municipal lighting is
evident, because such particular use was specified and, as we
have seen, made exclusive for a term of years and preferential
thereafter, in the Bink franchise.

Thus the principal proposition stated at the outset must be
answered in the affirmative.    The Wisconsin Electric Service
Company, as found, on the 21st day of December, 1907, be-
came the owner of a "license, permit or franchise," call it
what we may, from the state, characterized in the public util-
ity law as an indeterminate permit, of the scope, as regards
the privilege feature, of the Bink franchise, as herein deter-
mined.    The physical things in use and for use in connection
therewith, and the existing business to which the privilege
was referable, all became, by operation of law, merged in the

single thing, the public utility property. The franchise, in such circumstances, is the principal thing and, in general, is inseparable from the rest. The latter really partakes of the nature of the former. *Washburn v. Washburn W. Co.* 120 Wis. 575, 98 N. W. 539; *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 619, 108 N. W. 557. The entire thing is to be considered apart from the franchise to be a corporation which is inherently unassignable, and apart from such property franchises as are unassignable by their terms. The entire privilege element here was susceptible of ownership as property, subject to· the conditions and limitations of the public utility law, and so assignable to any purchaser competent to take thereunder,—a corporation duly organized under the laws of this state, sec. 1797*m*—75, Stats. (Laws of 1907, ch. 499).

The corporation which took title from the Wisconsin Electric Service Company seems to have satisfied all the requisites mentioned. If as a purchaser from the grantee of the state the public utility law cannot be referred to as expanding its corporate capacity if necessary to fit the situation, as in case of the original grantee, and so its capacity must be found in its articles, they seem to be sufficient. They specify the "manufacture, sale and distribution of . . . electric currents" for all purposes. That would seem to leave no infirmity in corporate power, since incidental to the broad general purpose there must exist the ordinary and reasonable means of effecting it. But in any event, the mere want of power could not be challenged collaterally. *John V. Farwell Co. v. Wolf,* 96 Wis. 10, 70 N. W. 289, 71 N. W. 883; *Eastman v. Parkinson,* 133 Wis. 375, 113 N. W. 649; *Security Nat. Bank v. St. Croix P. Co.* 117 Wis. 211, 94 N. W. 74.

Further, the third corporation was not much more than a mere conduit through which the property, by due conveyance, passed to and was vested in the fourth corporation, the respondent, which was organized for the particular purpose of

acquiring it and performing the public duties incident to its. ownership. It expressly purposed, among others, this: to "manufacture, distribute and sell electricity . . . for any and all purposes . . . to acquire the franchise rights, privi-- leges, contracts, real estate and electric lighting plant at *Chilton*, Wisconsin, for the purpose of reorganization, improve-- ment and operation, and to enjoy all the powers conferred by law upon domestic public-service corporations."

So, still laying aside for the present the effect of the at-- tempted repeal of the Bink franchise, the findings that plaint-- iff was competent to acquire and own the indeterminate per- mit aforesaid, and did so August 18, 1908, and continued to be such owner and to actually operate the property and per- form its public utility duties from that time down to the time of trial, barring some interferences mentioned in the findings, which need not be more than incidentally referred to, seem to be supported beyond room for successful challenge. That the corporation was organized in good faith by those whose money was invested in the property, as found, does not appear to be assailable.

The next basic question is this: What were the conditions: and limitations of the rights incident to the indeterminate permit? We have heretofore dealt mainly, with the privi-- lege feature, finding that it includes supplying the city of *Chilton* as well as its inhabitants with electric current for heat, light, or power, in short, all purposes, and maintaining- and operating a plant with all essential or convenient acces- sories to that end. But the mere privilege feature is one thing, while the conditions and limitations is another.

The trial court covered the subject of conditions and limi-- tations of the indeterminate permit as matter of fact, and permissibly so. It is of mixed law and fact, partaking more of the latter than the former.

The findings are to the effect that only the privilege feature-- of the old franchise, survived the surrender for its equivalent;

emanating directly from the state; that all the conditions and limitations of the old one and all contract features between the city and the owners of the privilege inherent in the grant, were extinguished by the surrender and superseded by the "conditions and limitations" of the public utility law. Is that finding correct?

The stated proposition is ruled in the affirmative by the letter and spirit of the public utility law and by the previous decisions of this court. *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.* 145 Wis. 337, 129 N. W. 600; *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530. After the full discussion of the subject in the last case cited, it does not seem best to go over the matter again, at least, more than briefly or incidentally.

The court there called attention to the significant language of sec. 1797m—77, "shall . . . receive by operation of law in lieu thereof, an indeterminate permit . . . and such public utility shall hold such permit under all the terms, conditions and limitations of this act." That negatives, as was said, "any idea that the legislature contemplated the so-called indeterminate permit would be subject to any conditions or limitations of the surrendered grant; that any limitation or condition was in legislative contemplation, except those 'of this act' independently of the scope of the mere privilege feature and appropriate police regulations. The idea was the exchange of a privilege held upon specified conditions and limitations mentioned therein or attached thereto for a new one of equal dignity" as to the privilege feature, "subject only to the conditions and limitations of this act." The court, further, after quoting sec. 1797m—77, said:

"Does not that language tell, without judicial aid, its own plain story, contemplating as to old franchises, in their entireties, a complete severance of all relations between sovereign authority,—whether exercised directly or through mu-

nicipal agencies,—and the owners of the franchises, by an optional exchange of old ones for new ones, equivalent as to the privilege element, denominated indeterminate permits? There is no suggestion in the statutes of coercion, no hint of a purpose to take away from franchise owners anything other than by their consent; exchanging in each case a privilege with new incidents for an old one with its incidents; a complete change from an existing to a new condition." . . .

"*Ex industria* the legislature said, 'the filing of such declaration shall be deemed a waiver by such public utility of the right to insist upon fulfilment of any contract theretofore entered into relating to any charge or service regulated by this act.' All such matters were henceforth to be referable to the public utility law under the supervision of the state commission. Such statute was made unmistakably exclusive as to everything affecting the service, its character, and charges therefor to consumers, whether public or private. The extinguishment of the obligatory features of the old franchise as to one side by necessary inference operated to extinguish such features as to the other. Such must have been the legislative purpose. . . . The thing existing after consummation of an exchange upon which respondent's business was dependable, was the new privilege, emanating directly from the state, denominated an 'indeterminate permit;' a permit to do the things theretofore licensed by the state through the municipality as a state agency, but now unconditionally, except as specified in the public utility law."

So it follows that the fifteen-year limitation of the Bink franchise, the condition in respect to the repeal of the privilege, and all other conditions and limitations mentioned therein, ceased to exist on the 21st day of December, 1907. The most significant thing at this point is the extinguishment of the repeal feature.

What are the conditions and limitations of the new privilege found in the public utility law? Everything of that nature, inherent in the old grant, or which, as between the state, acting through the city, and the grantee of the old privilege, formed part of the consideration for the grant, were by the same mutuality which originated them, extinguished,

in consideration of the incidents of the substituted privi-
lege,—the conditions and limitations of the public utility
law.

What are the substituted conditions and limitations men-
tioned? They are various. The determination of this case
does not require reference to all of them. There are several
features designed to give to the municipality adequate protec-
tion. One of primary importance is the right of the munici-
pality to take over the property by purchase upon "terms and
conditions determined by the commission." Sec. 1797m—
78. The public utility charges are required to be "reason-
able and just." Sec. 1797m—3. The municipality as a
consumer, as well as representative of its inhabitants, is made
competent to challenge before the commission the reasonable-
ness or justness of any of the rates, tolls, charges, or sched-
ules, or anything affecting efficient performance of the public
utility duties. Full power in this field is given the commis-
sion for efficient regulation, in harmony with the requirement
that the service shall be efficient and charges reasonable.
Sec. 1797m—43 and associate sections. Ample power as re-
gards police regulation is reserved to the municipality.
Sec. 1797m—87. Subject to the special right reserved to the
city, not having to do with rules and charges for service, the
whole field is placed under the supervision of the commission
with power to enforce the dominant purpose of the grant to
render it as certain as practicable that all public utility serv-
ice rendered "either directly or indirectly to or for the pub-
lic" shall be reasonable as to character, and reasonable and
just as to charges.

In consideration of submitting to full control by the com-
mission and the right of the municipality, at its option, to
take over the property as indicated, certain conditions and
limitations in favor of the grantee are attached to the new
privilege. The dominant feature thereof is that the fran-
chise shall not only be perpetual, subject to the conditions

and limitations of the law,—indeterminate as it is said,— but shall be subject to such conditions exclusively. In other words, the idea is that the grantee, under state control, and subject to prescribed limitations and supervision, shall have a "monopoly," as it has been several times called by the railroad commission, in its administrative work, and by this court, within the field covered by the privilege, as to rendering the particular public utility service, whether directly or indirectly, to or for the public.

We should say, in passing, that the term "monopoly" as thus used is to be taken in the sense of a mere exclusive privilege granted for a consideration equivalent; monopoly only in the sense that the field of activity is reserved to the grantee,—the mere element of exclusiveness. A privilege of that sort, where there is a consideration equivalent to the public, though often spoken of as a "monopoly" is essentially different from one of the character regarded as odious at common law and prohibited in many state constitutions; a privilege from the sovereign to the individual as a mere favor to the latter for his aggrandizement, or as such and the personal advantage of the individual sovereign grantor, the thing granted being by way of limitation, of what would otherwise be of common right, to the particular grantee. The term "monopoly" as it has been used to characterize the privilege in question, has been sanctioned in many jurisdictions, they sometimes differentiating it from "monopoly," in the offensive sense, and sometimes not, it being assumed, from the very nature of the case, that the word would be taken in its popular and common, rather than in its technical sense. In this line to justify, or rather explain the use of the term by the commission and the court, reference may be had to the following illustrations: *State v. Milwaukee G. L. Co.* 29 Wis. 454; *Davenport G. & E. Co. v. Davenport,* 124 Iowa, 22, 98 N. W. 892; *Ludington W. S. Co. v. Ludington,* 119 Mich. 480, 78 N. W. 558; *Bartholomew v. Austin,* 85 Fed. 359; *Charles*

*River Bridge v. Warren Bridge,* 11 Pet. 420, 607; *New Orleans G. Co. v. Louisiana L. Co.* 115 U. S. 650, 6 Sup. Ct. 252; *International T. C. Co. v. Hanks D. Asso.* 111 Fed. 916. In the latter case it is said that the word "monopoly" as now commonly used, and used in the patent law, is not a monopoly at all in the ancient sense. According to the logic of Judge STORY in the *Charles River Bridge Case,* to be such the privilege must not only be made exclusive by sovereign authority but be something theretofore of common right.

So while, in common parlance, it is proper to characterize the exclusive privilege in question, a monopoly, it is one purchased by giving an equivalent to the public, as in case of a patent allowed by the federal government. It is a grant for a public, not for a private purpose, and not a grant of that which without it would be of common right. It has none of the essentials of the monopoly so offensive, anciently, in the eye of the law.

While perhaps the term "exclusive privilege" is the better term to apply to the right in question, the word "monopoly" has been used in the books with reference to such franchises. The use of it seemed proper and in the particular matter it has been a handy word. It was doubtless more suggestive than the term "exclusive privilege," as regards the general conception by the administrative commission of the real purpose of the law, and that here, in regard to a matter supposed to be pretty clear though not yet specifically passed upon, and now before us for the first time for that purpose.

A few general observations at this point, in regard to the ground gone over, and passing remarks respecting matters which were immaterial at the start, or have been rendered so by the conclusions already reached, and we will return to the subject of whether the exclusive privilege in question excludes the city of *Chilton* from going into the electric lighting business, even to the extent of doing its own lighting, except under the conditions and limitations of the public utility

law; that is either by taking over the existing plant owned by respondent, or demonstrating to the commission, in due proceedings to that end, that public convenience and necessity require it, notwithstanding the existing public utility. To establish the negative of that proposition is doubtless the main purpose of this litigation.

Notwithstanding the care,—the comprehensiveness at all points of the public utility law, and the manifest purpose of it to remedy all the mischiefs of the old situation, prominent among them being the contests between owners of existing public utilities and others, including the municipality, striving to acquire the field, or some part of it, often to the great prejudice of all concerned, and manifest injustice to innocent investors, and notwithstanding the general trend of administration of the law by the commission, stopping just short of a definite stand on the particular point, and notwithstanding the plain logic of the decisions of this court, stopping short, it is true, of an adjudication of the particular matter,—it has remained, as we have suggested, so far, a mooted question as to whether the exclusive privilege of the public utility law acts prohibitorily upon the municipality as well as others desiring to invade the field of exclusiveness, as regards serving the public in the aggregate,—that is doing the municipal lighting, as well as serving patrons in general in their individual capacities.

To recur to the suggested general remarks before closing upon the final point,—as we have seen, respondent possessed an indeterminate permit at the time this action was commenced. As to electric service, it covered the whole field intended by the public utility law to be reserved to the holder of such a permit. We shall not spend time discussing the circumstances of the temporary suspension of service under the privilege. The privilege still existed. It could only be superseded or annulled by some proceeding under the law, directly to that end, so long as there was no abandonment.

None was taken.    The city, instead of submitting to the stat-
ute and proceeding thereunder, proceeded in defiance of it.
In good faith we may well conclude, through misconception
of its rights, but in defiance, nevertheless.    After acquitting
it of any bad intent, the fact still remains that its action was
utterly void in attempting to repeal the franchise which had,
in legal effect, been merged into the new franchise and so
passed beyond municipal authority to disturb it.    It follows,
necessarily, that defendant had no power to build a municipal
plant for encroachment upon respondent's exclusive field,
which, manifestly, from the findings well supported, was the
purpose, even laying aside for the moment the subject of mu-
nicipal lighting.    Having no such authority, clearly, it had
no authority to issue bonds to pay for carrying out its *ultra
vires* purpose.

So regardless of whether defendant complied with the
forms of law in respect to building a municipal lighting plant
and issuing bonds therefor, or either, the statutes to which its
actions are referable, from any viewpoint, were rendered in-
operative by the public utility law, except upon compliance
by the city with the conditions and limitations therein, in-
cluding the specified conditions precedent to capacity to build
a municipal lighting plant such as it proposed to build.
That it did not do, and did not propose to do, rendering re-
spondent helpless as regards protecting its privilege, invest-
ment, business, and field therefor, guaranteed by the public
utility law, other than by commencing this action.    That the
attitude of appellant and its acts committed and threatened,
cast a serious cloud on respondent's property rights and privi-
leges and was destructive thereof, rendering irreparable loss
imminent, as found, and that it was remediless to successfully
and adequately meet the mischief except by an appeal to the
jurisdiction of equity, in the judgment of this court, is well
supported in the record.    That gave respondent ample ca-
pacity to sue as it did.

Thus the findings which are material to some substantial relief embodied in the judgment, covering as they do some mixed matters of law and fact, are approved. As there are no further questions of fact, or of that nature, which may well be referred to, we turn to the scope of relief granted, as the second major division of the subject presented.

It is insisted that the judgment went too far by, in terms or effect, enjoining appellant from proceeding to build and operate a plant of its own for the purpose of municipal lighting, except conditioned upon a successful appeal under the public utility law for permission to invade the field claimed by respondent to be reserved to it subject to the conditions and limitations of such law.

This particular phase of the judgment counsel insist is legitimate, because it amounts, as said, to no more than a judicial declaration of the law, not dependable upon the form of the decree. That is the final, and we repeat, probably the dominant matter of controversy in the litigation.

Stating the proposition concisely: Does the public utility law, in the circumstances of this case, afford to the operator, under an indeterminate permit, preferential right to do the municipal as well as the private lighting, so that the municipality can no more invade the field itself than it can by a rival company, or the latter independently, all being in that respect subject to the judgment of the commission as to whether public convenience and necessity require the disturbance because efficient, adequate service at reasonable and just rates therefor is not obtainable under the existing franchise?

As before suggested, in terms or effect, during discussion of the findings of fact complained of, it would seem that the affirmative of this last question, basic and dominant as it is, follows inevitably from the logic, if not the letter, of *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530. It was there held that, the evident intention of the legislature, expressed in unambiguous language, when read in the

light of the situation dealt with, was, by treaty with the owner of existing franchises, to displace the old situation, in its entirety, with all its complications, the growth of years, and we may add, with all its bitter controversies, the like of which is pictured in this case, and to substitute a new situation, all looking to unity, in practical effect, of a multitude of diverse units corresponding to the many outstanding franchises, and others in prospect, harmonizing by making them referable to a single standard, to wit, the public utility law, and to an ultimate single control, to wit, control by the trained impartial state commission, so as to effect the one supreme purpose, *i. e.* "the best service practicable at reasonable cost to consumers in all cases and as near a uniform rate for service as varying circumstances and conditions would permit; a condition as near the ideal probably as could be attained." Certainly, that great object might well have aroused legislative ambition to a high plane, and inspired legislative wisdom accordingly, as it did in fact. Completeness of the law, so far as tested, and its success under the efficient conservative administration of it by the commission, bear witness to that. As, in effect, suggested in the *La Crosse Case,* the evident purpose of the law to produce the ideal condition indicated, and the means designed to that end, are so plain, and, we may add, so legitimate from all constitutional viewpoints heretofore suggested, or reasonably apprehended, and from all viewpoints of public and private economy and sound public policy, that, if to leave the door open where there is an existing privilege covering the field, as in this case, to municipal invasions to any extent, would greatly disturb the harmony of the system the legislature purposed constructing, and prevent the full accomplishment of the end sought to be attained, judicial construction, if that were necessary to determine the meaning of the law, should rather lean toward preventing such result.

In the further treatment, appreciating the somewhat repe-

titious character of it, but deeming that justifiable to bring out the final result with as much clearness as practicable, we will refer to some significant features of the statute.

We must keep in mind, as suggested in the *La Crosse Case,* that the state was competent to take to itself all authority as regards the scope of the privilege,—regardless of anything inhering in or connected with the old one,—by consent of the owners of the latter, cannot be doubted. The municipalities acted wholly as state agencies. As principal, it was competent for the state to make new arrangements with its grantees in place of the old ones.

We must further keep prominent the supreme purpose before stated: service as efficient as practicable at as low rates as just and practicable under the circumstances of each particular situation. That is shown in the premise portion of the act. The first section (sec. 1797m—1) deals with definition of terms, giving to each such comprehensiveness as not to leave any fair ground for claiming that any part of the situation to be dealt with was overlooked, either in the details of the plan, or the means of effecting it.

Treating of the new privilege, it was given a name so comprehensive as to include, without room for doubt, as before indicated, every sort of an existing privilege in the public utility field to serve the public. Note the significance of the term "either directly or indirectly to or for the public." In this, we repeat, nothing is left out, service to the public in the aggregate as well as in individual capacities, was unmistakably included.

The next section (sec. 1797m—2) deals with administration, giving the commission the broadest of legitimate powers in that regard so as to enable it to supply all details of administrative work. Note the language: "The railroad commission of Wisconsin is vested with power and jurisdiction to supervise and regulate every public utility in this state and to do all things necessary and convenient in the exercise of

such power and jurisdiction." There is administrative authority to the limit, including *quasi*-legislative as well as *quasi*-judicial power.

The next section deals with the great object of the act. "Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility . . . shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." Around the objective feature, all the balance of the provisions of the act are grouped, existing public utilities being necessarily placed in one group, and prospective public utilities in another, each for the necessary special treatment, to bring all under the single system and single control to effect the single purpose of promoting the public good without injustice to any one.

That one of the principal mischiefs sought to be remedied by the new system, was elimination of the conditions promotive of hostilities between municipalities and public utility companies, after making large investments by permission and invitation to serve the public directly as well as indirectly,—bitter controversies, sometimes for good reasons and sometimes not, but in any event at the expense of consumers of the product,—seems quite certain.

It likewise seems certain that one of the major means for attaining the desired end was elimination of excessive investments, and excessive expenses caused by two or more public utilities, each with its separate property and fixed charges, where the need of the consumers only required one, and elimination of risk to investors by encroachments, or threatened encroachments, upon an occupied field of public service without any public necessity therefor. Doubtless an unvarying and invariable economic law was squarely faced and appreciated, that all such subjects for elimination represent waste, which if not avoided would, in the main, fall on the product, increasing the cost of service per unit and be paid by the con-

sumers. It was the interests of consumers which was the prime subject of legislative solicitude; such object to be conserved without injustice to others.

In the situation pictured it could not have escaped legislative consideration, and, necessarily, would not have been considerately left unguarded against, that in the cities and villages of the state, in general, public utility service at the lowest practicable rates with the highest practicable efficiency, is impossible without combining the municipal service with that to others.

Further, it could not well have escaped appreciation and been left unguarded against, that one of the fruitful sources of waste to ultimately fall, largely if not wholly, on consumers, and fruitful sources of wasteful controversies and injustice to owners of existing investments, many of whom were bondholders as in this case, was opportunity for municipalities to unreasonably menace existing investments by threatening to displace, or actually displacing, in whole or in part, existing public utilities in cases where proper regulation would secure efficient operation; ample efficient service in the whole field, thus creating waste in many ways and to a large amount in the aggregate, to the impairment of efficiency, in general, and enhancement in cost, per unit of service to the customer, contrary to the purpose of the act.

In the light of the foregoing, strongly indicating that the legislature must have intended that the new privilege, where the old one occupied the whole field, in that it was granted to provide for service to the public directly as well as indirectly, and there was no other public utility at the time of the surrender of the old franchise, should be exclusive, let us turn further to the letter of the law.

Sec. 1797m—79 provides four distinct methods by which a municipality may become the owner of a public utility plant and conduct public utility business: 1st. By constructing a plant; 2d. By purchasing an existing plant by agreement;

3d. By condemnation of an existing plant whether operating under a public privilege or not; 4th. By purchase of an existing plant through the commission as provided in the act. In each case the power is granted "subject to the provisions of this act." Such provisions, in all cases of the existence of a privately owned plant, operated as in this case, require a permit from the commission upon a showing of public necessity and convenience. In that there is an unmistakable prohibition by implication. But plainer still is sec. 1797m—74:

"No municipality shall hereafter construct any such plant or equipment where there is in operation under an indeterminate permit as provided in this act, in such municipality a public utility engaged in similar service, without first securing from the commission a declaration, after a public hearing of all parties interested, that public convenience and necessity require such municipal public utility."

The words "similar service" plainly relate to the words in preceding sections, "either directly or indirectly to or for the public;" the words "public utility" relate as distinctly, to a municipality performing the service, whether "directly or indirectly to or for the public," as to a private corporation, and the words "operating under an existing permit" do not suggest, necessarily, in continuous operation,—absence of momentary or reasonable cessation. Excusable, temporary suspensions, involving no purpose to abandon, the owner being willing and seasonably, under the circumstances, able to resume and doing so, as in this case, satisfies the calls for a "public utility operating under," etc.

The law must be given a reasonable,—sensible,—construction, at all points, to the end that the legislative intent shall not fail, instead of looking with favor upon technical assaults upon it.

In this connection it should be remembered that in the proceedings before the railroad commission to displace respondent defendant grounded its claim on ownership by the Electric

Company, a domestic corporation, of the indeterminate permit, but that the company was not operating thereunder, and the petition was denied upon substantially the same grounds upon which respondent prevailed in this case,—particularly that it possessed an indeterminate permit and was excusable for the delinquencies claimed to have occurred. Thus there was an adjudication, to all intents and purposes, of the precise point, as it seems, which we now have in hand, so far as the commission had jurisdiction.

The conclusion which must result from the foregoing is that the relief granted respondent is not excessive. The field of exclusiveness of the privilege, in the circumstances of this case, includes municipalities, whether desiring to invade the forbidden territory for municipal lighting only, or for other or all purposes.

Thus the care with which the public utility law was framed as regards harmony of parts, and completeness and efficiency of details to accomplish the single purpose of promoting the highest attainable good of customers without injustice to existing vested interests, or prejudicial interference with competency for municipal ownership on a fair basis, is again vindicated. With the wisdom of the law we have nothing to do except as that may aid in understanding it. However, we may well say, that, in so far as the matter has come before this court, has been vindicated by the wise, efficient administration of it by the commission.

In closing, we again confess that much discussed by counsel has not been mentioned at least specifically. There was no need of it. No question, however, has been passed over without testing it carefully for materiality. With much care to eliminate all inconsequentials, the discussion has been so extended as to make the opinion quite long, and necessarily so, because of the endeavor to respond fully to the effort of counsel to secure treatment of the vital points in all reasonable aspects. The facts being determined, and we must say, in

passing, as to pure matters of fact, there was little or no room in the evidence for serious controversy, the result turned wholly on the terms of the statute in which we find little or no ambiguity. So, necessarily, the great range of treatment by counsel, supported by numerous authorities, was largely outside the real case in hand. No part of that, it is thought, has escaped attention.

*By the Court.*—The judgment is affirmed.

The following opinion was filed February 23, 1912:

TIMLIN, J. I concur in the decision of the court and in much that is said in the opinion of Mr. Justice MARSHALL. In so doing I understand the court does not attempt to decide that by the surrender of the pre-existing franchise and the acceptance of an indeterminate permit an irrepealable contract is created between the municipality and the public-service company. It is said in the opinion: "The dominant feature thereof is that the franchise shall not only be perpetual, subject to the conditions and limitations of the law— indeterminate as it is said,—but shall be subject to such conditions exclusively." If this is meant to say or suggest that "indeterminate" means "perpetual," subject only to the conditions presently existing in the statute, I do not agree with it. Indeterminate does not mean perpetual; it means "not determinate; indefinite; not distinct or precise as to limits, character, or meaning; vague; as, indeterminate symptoms; an indeterminate series; indeterminate feelings or ideas; not fixed or known beforehand; not predetermined as to date, place, or the like; as, an indeterminate appointment; not leading to a definite end or result; as, an indeterminate debate. In criminal law a sentence which fixes the period or amount of punishment only within certain limits, leaving the exact term or amount of punishment to be determined by the executive authorities, usually a board of managers." This is the definition given in Webster's New International Dic-

tionary.   See, also, sec. 4971, Stats. (1898).   I consider the
public utility law subject to repeal or amendment like other
statutes, and I feel sure the legislature had no intention of
making it otherwise.   This case does not call for the decision
of any such question, but I fear the opinion may be misun-
derstood.

The following opinion was filed March 4, 1912:

MARSHALL, J.   Since this case was concluded, I have dis-
covered a mistake in the opinion I wrote for the court in *La
Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W.
530.   I take the whole responsibility for it and confess there
is little, if any, excuse for the inadvertence.   I take this occa-
sion for correcting the error so far as I can.

On page 417 of the opinion, speaking of a privilege, such
as was grantable to an individual as well as to a corporation,
this language was used: "The entirety was a state grant and
so under legislative control like any other *corporate state
franchise.*"   The idea the language might naturally convey
was not in mind.   Of course such a privilege might be the
franchise or property of a corporation, but not a corporate
franchise.   The two things are radically different.   It is in-
comprehensible, that I could have thus confused the two in
view of the former confusion which found place in the books
after the correct doctrine was declared in *Att'y Gen. v. Rail-
road Cos.* 35 Wis. 425, 560, which difficulty was removed in
*State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441,
83 N. W. 697, followed by *Linden L. Co. v. Milwaukee E. R.
& L. Co.* 107 Wis. 493, 83 N. W. 851, and *In re Southern Wis.
P. Co.* 140 Wis. 245, 122 N. W. 801,—the initial corrective
case having been written by me.   As said, in terms or effect,
in all, it is only a franchise by act of incorporation, or a cor-
porate charter, or a privilege inhering therein as a part of the
organic act which is a corporate franchise, and so within

sec. 31, art. IV, of the constitution prohibiting the granting
of corporate powers or privileges by special act and within
sec. 1, art. XI, as to legislative power to grant corporate char-
ters, but reserving the right to repeal, alter, or amend.   To be
within such, the franchise must be "essentially corporate,"
using the language of the chief justice in the *Linden L.
Co. Case* quoted from that of Chief Justice RYAN in *Att'y
Gen. v. Railroad Cos.,* "That is, as we understand it, franchise
by act of incorporation."   The mere governmental privilege,
not corporate, is a thing of proprietary nature, which, as in-
dicated in *In re Southern Wis. P. Co., supra,* may be granted
to a corporation as well as to an individual, or to the latter
and be sold to the former, or, in general, pass from owner to
owner like any other property.

The logic of the foregoing is most distinctly stated as mat-
ter of elementary law in the *Water Power Cases, ante,* p. 124,
134 N. W. 330, where the court declared grants of such fran-
chises, without reservation, not subject to recall.

It would be most unfortunate if after all the labor in *La
Crosse v. La Crosse G. & E. Co., supra,* and here, to make the
meaning of the public utility law unmistakable and give sig-
nificance to the condition of stability the legislature purposed
creating thereby, the old confusion were revived through my
passing remark in the former case, or if the clarity hoped for
from the two cases were disturbed by the thought that a mere
legislative privilege of proprietary nature to do one thing is
different from such a privilege to do a different thing, as re-
gards whether a corporate franchise or not.   What power of
change exists as to a privilege granted under the public util-
ity law because of its being subject to the conditions and limi-
tations thereof, is another thing, as has been iterated and re-
iterated over and over again.