Neacy, Appellant, vs. Board of Supervisors of Milwaukee County and others, Respondents.

*November 18—December 6, 1910.*

*Statutes: Construction: Counties: Relocation of house of correction: Acquiring land by purchase: Rescission: Taxpayer's action: Fraud of public officers: Degree of proof: Appeal: Findings of fact: Duties of trial judge.*

1. Where language in a statute, taken literally, is meaningless, but the legislative intent is manifest from the context or history of the enactment, words may be transposed, stricken out, or interpolated, or may be given a very restrictive or a very broad meaning, in aid of judicial construction, for the purpose of giving effect to such manifest intent.

2. Thus, by transposition and addition of words, ch. 356, Laws of 1903, is construed to read as follows: "In any county in this state which now maintains or shall hereafter maintain, or shall desire to establish or relocate and maintain, under any law of the state of Wisconsin, a house of correction . . . whenever it shall so determine the county board of such county may provide for acquiring and may acquire . . . all necessary land

upon which to locate, relocate and maintain such house of correction," etc.

3. In an action by a taxpayer to rescind a transaction whereby a county has acquired title to lands for a public purpose, the basis of the action being alleged fraud of public officers involving moral turpitude or the commission of a criminal offense, such fraud must be established by clear and satisfactory evidence, as distinguished from a mere preponderance of the evidence.

4. Findings of the trial court in such a case negativing the alleged fraud will not be disturbed on appeal unless palpably unsupported by evidence and having no reasonably fair basis in the record.

5. The power of eminent domain need not be exercised where a municipality and a person whose land is desired for public use agree upon the amount to be paid therefor; and such agreement may properly be reached through the aid of appraisers whose valuation of the land is not to be binding upon either party but to be treated as advisory only.

6. MARSHALL, J., speaking independently, suggests a stricter compliance by trial judges with the statute (sec. 2863, Stats. 1898) relating to findings of fact and conclusions of law.

APPEAL from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed.*

Taxpayer's action to secure a rescission, on the ground of fraud, of a transaction whereby the county of *Milwaukee* acquired title to certain lands for public purposes; a cancellation of conveyance made to the county in respect to the matter; an injunction against making any payment for the property; and recovery into the county treasury of any money paid.

The issues joined by the complaint and various answers thereto, were closed by findings, a summary of which will show with sufficient clearness, for the purposes of the appeal, the nature of the case, evidence adduced by the respective parties, and the result. The following is such summary, omitting such matters as merely go to the capacity of plaintiff to bring the action and the necessity or propriety of making the several persons named as defendants parties to the litigation:

1. The board of supervisors of *Milwaukee* county having duly decided to purchase land for location of a house of correction, pursuant to their resolution, advertised for proposals from landowners,—having suitable premises for such purpose, one essential being a stone quarry on the lot,—to sell the same to the county, each proposal to have certain prescribed incidents.

2. Several proposals were received and among them one from *Johanna Zautcke* and other defendants, constituting the *Zautcke* heirs, to sell a tract described in the complaint, consisting of 210.20 acres for $115,000, and one from defendant *Conrad K. Reichert* to sell for $48,000 an eighty-acre tract described in the complaint.

3. All offers were submitted January 29, 1907.

4. Upon consideration of the matter the board chose such two tracts, the price to be fixed by an arbitration committee, made up of three members of the board, appointed by the chairman, three persons appointed by the owners of the lands, and one person appointed by the six.

5. The plan to so fix the price originated with one of the landowners and was presented by a member of the board.

6. A committee was appointed accordingly, which subsequently reported the value of the Zautcke tract of 208.27 acres at $117,216 and of the Reichert tract of 76.40 acres at $47,320, based, among other things, upon information as to recent sales of near-by property, including one in the fall of 1906 at $1,200 per acre and one in the spring of such year at $1,000 per acre, both parcels having railroad frontage, and sales of some adjacent lots. The committee further reported that the appraisal was at the market price without reference to any element respecting the stone quarry or advantage obtainable by selling the land in parcels, which it was suggested would be considerable.

7. The day of the report *Reichert* offered to sell his land to the county at the appraised value on terms of payment specified.

8. Thereupon the board resolved, reciting the facts aforesaid, to accept the report and to purchase the two tracts of land at the appraised values and to issue county orders accordingly, upon the title being approved by the district attorney and proper conveyances being made and delivered.

9. The report was incorrect, in that the land said to have been sold for $1,200 per acre was in fact sold for $1,000 per acre, and a trifle over one acre of that said to have been sold for $1,100 per acre was in fact sold for $300 per acre, conditioned upon the purchaser putting up a factory and employing therein 500 men and obtaining an option to buy eleven acres more at a price to be fixed on a sliding scale of $1,100 to $100 per acre according to the number of men employed at the factory. The truth of the matters misrepresented could have been largely obtained from public records and wholly by diligent inquiry. The committee based the misstatements on reports to them which they believed to be true.

10. The idea of those who voted for the arbitration committee was to thereby reduce the asking price for the lands. The report was not, in general, considered as binding on the board, and while the members believed it to be true, they were personally familiar with the value of the lands and, in the end, acted upon such knowledge, so the result would not have been different had they known the exact facts in regard to the two sales.

11. The reasonable value of the lands, exclusive of the stone quarry feature, does not exceed $400 per acre. Such feature is of no commercial value for an operating business. Its value to the county is dependable upon utilizing convict labor successfully.

12. The average purchase price of the two tracts of land is $570 per acre.

13. The determination of the purchase price was not characterized by fraud.

14. After conclusion, as aforesaid, of the negotiations to purchase the lands in due course the district attorney of the

county approved the titles and proposed conveyances, and such conveyances with approved abstracts were duly tendered to the county: and county orders for the purchase price demanded. The demand in each case was refused.

15. The refusal was predicated upon pendency of this action, and advice of the district attorney that consummation of the purchase should await termination of the litigation.

16. The members of the arbitration committee were not pecuniarily interested in the purchase and those uniting in the report acted in good faith, according to their best judgment.

17. The county board with all matters aforesaid before it and stated in the complaint ratified the agreement to purchase.

18. Neither of the persons interested in the lands nor any defendant was guilty of deceit or exercising undue influence with the board or any member thereof.

Upon the facts aforesaid the court decided that the county board had authority to make the contracts; that they were free from taint of fraud, were binding on the county, and that judgment was due defendants dismissing the complaint with costs. Judgment was rendered accordingly.

For the appellant there was a brief by *Harper & McMynn,* and oral argument by *R. N. McMynn.*

For the county of *Milwaukee* there was a brief by *Chas. A. A. McGee,* district attorney, and *Norman L. Baker,* assistant district attorney.

For the respondents the *Zautcke* heirs there was a brief by *O'Connor, Schmitz & Wild,* and oral argument by *J. L. O'Connor* and *Robert Wild.*

For the respondent *C. K. Reichert* there was a brief by *John F. La Boule* and *Adolph Huebschmann,* and oral argument by *Mr. Huebschmann.*

MARSHALL, J. The court has considered with care the various errors assigned and the result will be stated briefly.

The nature of the questions raised is such as to render extended discussion unnecessary.

The first matter presented is whether the county possessed power to purchase the real estate and relocate its house of correction.    That is referable to ch. 356, Laws of 1903.    The trial court found authority conferred thereby, reaching that conclusion by judicial construction which counsel for appellant contend is wrong.

We start with the concession by appellant's counsel, concurred in by respondents' counsel, that if the chapter referred to, properly construed, empowers a county, after having once located a house of correction, to purchase land for a relocation thereof, then power existed in the circumstances of this case, otherwise not.

Notwithstanding the laborious argument of counsel respecting the meaning of the law of 1903, in our judgment, it is quite plain and can easily be read from the language used notwithstanding the senseless nature thereof, taken literally. The law is a striking illustration of the careless legislation courts have to deal with.    If it were not for the instrumentalities, called rules for construction, which enable courts to get sense out of an enactment, if any was put there by the lawmakers and not hidden so as to be undiscoverable, much written law would be found on our statute books which could not be given the legislative purpose, and some which could not be given any effect at all.

The difficulty here grows out of these words in the law of 1903:

"Whenever in any county in this state, which now maintains or shall hereafter maintain, under any law of the state of Wisconsin, or which shall desire to establish, or relocate and maintain a house of correction by whatsoever name known or called, for the detention of any person or persons who may be lawfully confined therein, the county board of such county may provide by resolution for acquiring, and may acquire, take and hold, by purchase or condemnation for, and in the name

of such county, all necessary land upon which to locate, relocate and maintain such house of correction; . . . and whenever the county board of any county now maintaining a house of correction . . . shall have decided to change the location of its said house of correction as is hereby authorized and shall for such purpose have acquired land," etc.

It will be seen, at a glance, that the opening lines quoted, which evidently were designed to state the situation to which the power, granted by the language commencing with the words "the county board of such county may provide," refers,—are incomplete. They do not, unaided by construction, make any basis for what follows. When did the legislature intend that such power might be exercised? That it was intended to include such a situation as existed in this case is put beyond room for reasonable controversy by these words, following the words of grant: "and whenever the county board of any county now maintaining a house of correction . . . shall have decided to change the location . . . as is hereby authorized," suggesting clearly such previous authorization to have been included in the language going before. Thus, in the last clause of the quoted language, we have the clearest of legislative recognitions of its having granted in a preceding clause the power to relocate a previously established house of correction. Such being the case, by necessary implication, words were inadvertently omitted from or added to the previous clauses, or words were transposed, rendering the legislative purpose, looking to such clauses alone, obscure. It follows that words necessary to be supplied should be deemed to be in place by necessary or reasonable implication, and words necessary to be displaced, so far as evidently inadvertently used,—to bring out the sense manifestly intended should be regarded as surplusage,—and words necessary to be transposed to that end should be given their proper place, all by familiar rules for judicial construction.

Many examples of interpolation and rejection and transposition of words to render a legislative enactment capable of

being given a sensible effect in accordance with the purpose
of the lawmakers, are given in Endlich on Construction of
Statutes at §§ 298 to 305, inclusive, and §§ 317 to 319, in-
clusive.

The author cited says, referring to authority:

"A mistake apparent on the face of an act, which may be
corrected by other language of the act, is never fatal.    In all
such cases, it may, with propriety, be said that the context
rectifies the error, and it is not the court that assumes to cor-
rect the legislature. . . . The judicial interpreter may deal
with careless and inaccurate words and phrases in the same
spirit as a critic deals with an obscure or corrupt text, when
satisfied, on solid grounds, from the context or history of the
enactment, or from the injustice, inconvenience, or absurdity
of the consequences to which it would lead, that the language
thus treated does not really express the intention, and that his
amendment probably does." [Sec. 319, p. 437.]

The stated doctrine has been often applied by this court to
the extent of transposing, striking out, interpolating, and giv-
ing words a very restrictive or very broad meaning to carry
out a manifest intent, or to avoid a very unreasonable or ab-
surd result; one that could not reasonably have been intended,
or to turn the literal sense, which is expressionless, into sen-
sible, reasonable meaning.    The following are good illustra-
tions: Att'y Gen. v. West Wis. R. Co. 36 Wis. 466, "or" elimi-
nated and "and" substituted; Palms v. Shawano Co. 61 Wis.
211, 21 N. W. 77, words regarded as surplusage and correct
words substituted for those wrongly used; Custin v. Viroqua,
67 Wis. 314, 30 N. W. 515, omission in a recital supplied;
State ex rel. Heiden v. Ryan, 99 Wis. 123, 74 N. W. 544,
"state prison" construed to mean the place commonly known
by that name, or any other place in the state for similar use
by whatever name known; State ex rel. McGrael v. Phelps,
ante, p. 1, 128 N. W. 1041, modifying phrases interpolated.

The citations from our own reports are ample, but this field
of construction has become so important in recent years by

reason of the many legislative crudities with which we have had to deal, that it may be well to indicate by the general trend of authority that the application of rules for construction here has been none too radical.

It is to be borne in mind that judicial rules are never to be applied to put a meaning into an enactment, but to get the intended meaning out of it; never to vary the intended meaning in any way, but to go to the uttermost boundaries of reason to read from that which the legislative department has placed before the public the purpose thereof, and to do that without violation of rules of language or of law.

Here are a few of the many foreign illustrations of the foregoing, which are at hand: *Kennedy v. Gibson,* 8 Wall. 498: an act, in terms, authorizing suits "against" an association to be brought in a particular jurisdiction, construed as authorizing suits in such jurisdiction to be brought by or against, the words "by or" being interpolated.   In *State v. Lee,* 37 Iowa, 402, the words "or both such fine and imprisonment at the discretion of the court," eliminated by construction.   In *Lyde v. Barnard,* 1 M. & W. 101, 115, the word "upon" eliminated.   In *Waters v. Campbell,* 4 Sawy. 121, a clause in the statute read as if followed immediately by a provision found in preceding lines without immediate connection.   In *State ex rel. County Comm'rs v. Zanesville & M. T. R. Co.* 16 Ohio St. 308, a clause included in the second section of an act, read as if included in the first, qualifying the provisions of the latter.

Applying the foregoing to the act before us, the error in the first clause is corrected materially by the last clause, showing that the preceding, in part, related to the purchase of lands for the relocation of a house of correction.   The collection of words carelessly used to express such purpose is rendered clear in literal sense, in harmony with the manifest intent, by transposing from their legislative location the words "under any law of the state of Wisconsin," to a place after the words "or

relocate and maintain," and expanding the word "whenever" so as to express with its appropriate context the idea intended and fairly suggested, by adding thereto the words, "it shall so determine," or similar words, and placing the whole as a qualifying clause after the word "therein." The result is this: "In any county in this state, which now maintains or shall hereafter maintain, or which shall desire to establish or relocate and maintain, under any law of the state of Wisconsin, a house of correction . . . whenever it shall so determine, the county board of such county may provide for acquiring and may acquire . . . all necessary land upon which to locate, relocate and maintain such house of correction," etc.

An examination of the original bill shows that the words thus efficiently transposed, in the law of 1903, were misplaced by carelessness at the start, and that they persisted to the end, notwithstanding the bill took all the ordinary steps in its course to lodgment in the office of the secretary of state as a completed enactment, including consideration by three committees. However, the real meaning is made very plain, as we have seen.

The various errors assigned respecting whether the findings are against the clear preponderance of the evidence, we will dispose of without extended discussion of exceptions in detail. On this branch of the case we bear in mind that appellant's case is based on fraud, requiring the facts in that regard to be established by clear and satisfactory evidence; a higher degree than is necessary in ordinary civil cases.

True, as has been suggested upon previous occasions, the distinction between establishment of a fact by a preponderance of the evidence to a reasonable certainty, and establishment thereof to such certainty by clear and satisfactory evidence, may be somewhat shadowy; but it is considered that there is such a distinction which is so substantial that a definite rule in respect thereto was logically formulated at an early day and has become a significant feature of our judicial

system. Such feature must, necessarily, vary in importance according to the depth of moral turpitude of the fraud alleged. When such turpitude involves the question of whether several public officers are guilty of having abused their public trusts to an extent rendering them proper subjects for prosecution and punishment as criminals, it has importance not much less than the degree of certainty requisite to a conviction in a criminal case, though, of course, yet substantially less. It was once held not even such degree (*Freeman v. Freeman,* 31 Wis. 235), but later that was modified, as stated in *Poertner v. Poertner,* 66 Wis. 644, 29 N. W. 386; *Maldaner v. Smith,* 102 Wis. 30, 78 N. W. 140.

In the latter case the court said:

"The presumption of innocence and fair dealing among men is so persuasive that a situation which violates it calls for evidence of a more clear and satisfactory character than one that does not involve moral turpitude or the commission of a criminal offense. Consistent with that idea, the rule is well recognized that where fraud, whether constituting a criminal offense or not, is alleged as the foundation of the action, but especially in case of the former, it must be established by clear and satisfactory evidence or there can be no recovery. The more serious the nature of the fraud charged, the more rigidly should that rule be applied."

In view of the foregoing and the respect which otherwise must be given to the decision of the trial court as to issues of fact, the findings complained of cannot be disturbed unless they appear so palpably unsupported by evidence as to lead to the conviction that they do not evidence the elements of judicial consideration and judgment which should be devoted to such matters; that from bias or inadvertent or other omission to properly heed plain evidence, or heed it at all, conclusions were reached having no reasonably fair basis in the record. Such degree of clearness of error in a case of this sort, is necessary in order to respond to the call for a clear preponderance of evidence; giving due weight to those elements com-

monly presumed in such situations to have been probably helpful in aiding the trial court to arrive at his conclusions, and which we cannot have the benefit of. The importance of the latter element as a counter weight to appearances from the printed record only, of error as to matters of fact, has often been referred to. *Hill v. American S. Co.* 112 Wis. 627, 88 N. W. 642; *McGarry v. Runkel,* 118 Wis. 1, 94 N. W. 662; *Harrigan v. Gilchrist,* 121 Wis. 127, 312, 314, 99 N. W. 909; *Rankl v. Schmidt,* 133 Wis. 103, 113 N. W. 423; *Litts v. Goss,* 135 Wis. 405, 115 N. W. 1091.

Without further discussion of this branch of the case or referring in detail to evidence to justify our conclusions, we will close it by merely stating that we come quite short of discovering error in the trial court's conclusions of fact with the clearness requisite to efficiently overturn them in any material degree.

It has been suggested that the purchase price of the property was arrived at in an illegal manner; that in case of inability of a municipality and a person whose property is desired for public use, as in this case, to agree upon the compensation to be rendered therefor, the power of eminent domain is to be exercised to that end, as provided in sec. 694c, Stats. (1898). The infirmity in that position is based on false premises. The essential of inability to agree did not exist in this case. The proceedings for an appraisement were not resorted to for the purpose of compelling the landowners to part with their property at a price not satisfactory to them, but for the purpose of arriving at an agreement as to price, rendering compulsory proceedings unnecessary. The result of the appraisement was not binding on either party and was not considered as binding. It was only treated as advisory,—a mere aid in reaching an agreement. The result was in the nature of an offer on one side and an acceptance on the other, thus arriving at an agreed price.

It is not thought best to say more in deciding the appeal.

An opinion of great length might easily be written by taking up, in detail, the multitude of matters, mostly those of fact, included in the printed record of 500 pages of case and 300 of arguments. It would serve no purpose except to satisfy counsel, if that were necessary, that the subjects so laboriously presented have all challenged attention. They must be satisfied with the court's assurance in that regard.

*By the Court.*—Judgment affirmed.

The following opinion was filed December 15, 1910:

MARSHALL, J. (*speaking independently*). A few observations seems to me to be appropriate respecting the general character of the findings. The remarks in respect thereto are to be considered largely matter of personal judicial suggestion for the better observance of the statutory duty created by the written law, sec. 2863, Stats. (1898), providing that, in a case of this sort, the trial "judge shall state in his decision separately: 1. The facts found by him; and 2. His conclusions of law thereon." Few statutes, if any, can be found so concise and plain as that. There is no statute respecting the practice, strict compliance with which would be more conducive to good, speedy, and certain administration of justice, yet no statute so frequently violated in letter or spirit, or both. The most frequent violations are by general findings, not responsive at all to the command of the law, that the judge shall state "separately" the facts found by him. Such infirmity leaves this court to perform the arduous labor of searching through a long, complicated record to find out just what precise matters of facts were definitely passed upon. That species of findings has been said not to arise to the dignity of an attempt to comply with the statute, and to not be entitled to consideration within the rule that findings of fact will not be disturbed on appeal unless against the clear preponderance of the evidence. The abuse in that field has been so per-

sistent, notwithstanding frequent suggestions that the making of such findings constitutes error which should not be indulged in merely because of the rule applicable to the generality of cases that it may not be deemed fatally harmful, that it has seemed necessary (*Damman v. Damman,* 145 Wis. 122, 128 N. W. 1062) to indicate that such abuse may be fatal to the result.

In my judgment the common departure referred to is not more harmful than that of putting upon counsel the duty of drafting findings to be signed, which, generally, in my judgment, results in very different findings, in form and sometimes in fact, than would otherwise be filed.  Such partisanly prepared findings, however conscientiously drawn, are likely to be so general as not to disclose with a reasonable degree of definiteness the issues passed upon, or to be so argumentative and amplified by mere evidentiary matters, or otherwise, as to double or treble, or more, the work sufficient to enable one here to comprehend the precise method by which the final result was reached.

In this case the findings were composed of some over 5,000 words.  To facilitate study thereof the writer reduced them to about eight folios.  I may well assume it would have been easier for a person so thoroughly possessed of the case as to satisfactorily decide it, to draft concise findings, than study with sufficient care to be able to judicially comprehend such a draft as was presented for approval.  The work of drafting such findings as the statute calls for, with the aid of a good stenographer, when the case is ripe for decision, is such that, as a rule, the labor of the trial judge is increased rather than diminished by leaving the work to the attorneys, resulting as it did in this case.

The foregoing must be understood as written to suggest methods, from experience of the writer, how the work performed by many hardworked circuit judges may be lessened rather than increased, and how much expense, delay, and un-

certainty in the administration of justice may be saved. In this case the learned circuit judge at great labor wrote and promulgated an opinion which the law does not require, expending in preparation thereof several times the work needed to prepare the concise findings which the law does require, and then was compelled to study somewhat partisan findings, drafted by judicial request, composed of thousands of words, devoting work thereto, in order to intelligently sign them, largely in excess of that needed to draft concise findings, composed of the few hundred needed words.

It is painful to the writer to see so much burdensome work needlessly done because of not more directly complying with the statute. I make this statement fully so that the overworked judge may not regard a suggestion which is intended to be helpful to him in his administration and show a way of lightening his burden; as one which, if followed, would increase his labor.