STATE EX REL. HAYDEN, Respondent, vs. ARNOLD, Tax Com-
missioner, Appellant.

*October 8—October 29, 1912.*

*Officers: Unlawful removal: Remedies:* Mandamus: De facto *officers:*
*Statutes: Repeal by implication: Construction: City civil serv-*
*ice law: Head of principal department: Tax commissioner: Re-*
*moval of subordinates: Assessors.*

1. *Mandamus* is a proper remedy where a person has been unlaw-
fully removed from office, regardless of the place having been
filled before commencement of the proceedings.
2. The *mandamus* remedy, in exceptional cases, may or may not be
used, in the discretion of the court. There is no absolute rule
as to use of such remedy to obtain possession of an office, ex-
cept, it is not proper in case of a claimant having no *prima*
*facie* title against one in possession holding by right, at least
*de facto.*
3. In harmony with the liberal spirit of the Code, the use of *man-*
*damus,* in general, should be favored where permissible at all,
as the most expeditious mode of vindicating the right.

4. Repeals of written law by implication are not favored; there-fore, if two legislative enactments, in terms, seem to conflict, they should be reconciled if practicable, and, if not, the earlier should give way to the later, in harmony with the presumed legislative intent.

5. All rules for statutory construction are subservient to the one that the legislative intention must prevail if it can reasonably be discovered expressed in the language used for that purpose.

6. By the civil service law (ch. 313, Laws of 1895), the manifest general intent was to place all municipal officers, in the cities referred to, except such officers as are specially excepted, under the merit system, both as to appointment and retention.

7. Where the general intention in the passage of a law, is plain, the enactment, in case of uncertainty, should be liberally con-strued to effect such intent.

8. In case of obscurity in a legislative enactment, the general un-derstanding by all administrative officers having to do with applying it, which has subsisted for a long term of years, is strong, and in some cases conclusive, evidence of the true mean-ing.

9. The civil service law (ch. 313, Laws of 1895),—by necessary im-plication from its terms, by its manifest general purpose, and by such long understanding as to become, in practical effect, a part of it,—superseded all city charter provisions relating to the appointment and removal of assessors, inconsistent there-with.

10. Under such civil service law, the tax commissioner in the city of Milwaukee, is the head of a principal department, having power to appoint the ward assessors as his subordinates and the power to remove them, anything in the city charter, existing at the date of the enactment, to the contrary notwithstanding.

11. A person who has been, under the forms of law, dispossessed of an office to which he, at best, had only a *de facto* right, is not entitled to regain possession by *mandamus*.

12. The rule giving *de facto* dignity to the occupant of an office, is for the protection of the public; not to furnish him a weapon with which to regain possession. Being possessed thereof, he can defend against one who attempts to intrude thereinto; but cannot rely upon his *de facto* character to gain or regain that to which he has no right, in fact.

13. The power of appointing and removing subordinate officers hav-ing been conferred upon their superior, and procedure provided for executing such power and for use of a removed officer, in case of his deeming himself aggrieved, such procedure is ex-clusive in case such superior, in good faith, acts within the law.

[Syllabus by MARSHALL, J.]

State ex rel. Hayden v. Arnold, 151 Wis. 19.

APPEAL from an order of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Reversed.*

*Mandamus* to compel the tax commissioner of the city of Milwaukee to recognize the relator as assessor of the Third ward of such city and to fully reinstate him in such position. The following appeared by the petition:

For some time prior to January 31, 1912, the relator was assessor of the Third ward of the city of Milwaukee, duly appointed and qualified as such under the civil service law and rules. In the meantime the boundaries of such ward were, by a municipal ordinance under authority of ch. 436, Laws of 1901, changed so as to locate two assessors therein. On such date the tax commissioner of the city, pretending to act under power vested in him by the civil service law, notified relator of the change of ward boundaries, with the result stated, while only one assessor could legally perform the duties of the office, and that by reason thereof such relator was "removed and discharged" from his position. Since such time such commissioner, as president of the board of assessors of such city, has declined to recognize the relator as assessor of such ward or a member of the board of assessors, or permit him to perform the duties of such office. The ordinance changing the ward boundaries was not published till July 3, 1911. By ch. 497, Laws of 1911, published July 3, 1911, and by its terms to take effect from and after its passage and publication, the law under which the ward boundaries were attempted to be changed was repealed. Further facts were stated to show that the ordinance was void because of failure to comply with the law in attempting to make the change of ward boundaries. An alternative writ of *mandamus* was issued, motion made to quash the same, and denial thereof. This appeal is from the order accordingly entered.

For the appellant there was a brief by *Daniel W. Hoan,* city attorney, and *Garfield S. Canright,* assistant city attorney, and oral argument by *Mr. Canright.*

For the respondent there was a brief by *Miller, Mack &*

*Fairchild,* and oral argument by *George P. Miller* and *J. G. Hardgrove.*

.MARSHALL, J.   Is *mandamus* a proper remedy to restore a person to an office from which he has been unlawfully removed?

In examining authorities bearing on the proposition stated, at least, the following situations should be observed:

(1) In general, where a person has been ousted from office, unlawfully, as he claims;

(2) Where a person was ousted and an action for possession commenced and brought to trial before the vacancy, thus in form created, was refilled;

(3) Where the circumstances exist as in No. 2, except the vacancy was filled after commencement of the action;

(4) Where a person seeks original possession of an office against the one holding the same by right, *de facto,* the outside claimant having no *prima facie* title;

(5) Where a person, having *prima facie* evidence of title, seeks possession of an office against one therein holding the same in defiance of such *prima facie* title and without color of right himself, other than such as mere possession might indicate and afford.

Failure to note these differences, it is thought, has led to some apparent conflict in decisions.

In some cases, involving the right of a person claimed to have been unlawfully ousted from an office to use the *mandamus* remedy to repossess himself thereof, the subject will be found treated in a broad general way as if such remedy were proper in all such cases, as for example, *State ex rel. Gill v. Watertown,* 9 Wis. 254.   This court there, speaking by Mr. Justice PAINE, said:

"It cannot be necessary to examine authorities to show that a *mandamus* is a proper remedy to restore a party to the possession of an office from which he has been illegally removed.

If citations were necessary, the following list would seem to place the question beyond discussion," giving a large number of illustrations.

An examination of them at this time is not satisfying that the broad general declaration was grounded on adjudications referred to; but was based on several standard elementary works, which support it so fully, it seems evident the court did not think there should be any fine distinctions between the different situations which may be characterized by an unlawful ouster from office. That would not militate against the propriety of a trial court exercising some measure of discretion as to whether to allow such remedy or not and deny it in case of the office being occupied at the time of suing out the writ and the real right of the matter being better triable by *quo warranto,* which could not often be the case, since the court might make the incumbent a party to a *mandamus* proceeding, if not so made at the start. The mere form of remedy is not of controlling consequence under the Code. Whether the particular remedy is appropriate to the case is the main thing,—not whether it is the sole remedy, but, is it a proper one because it is appropriate to the end sought.

This court has held that, under some circumstances, a person, who has never been in possession of an office claimed by him, may use the *mandamus* remedy to gain it of an adverse claimant. *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296; *State ex rel. McCoale v. Kersten,* 118 Wis. 287, 95 N. W. 120. In *Board of Ed. v. State ex rel. Reed,* 100 Wis. 455, 76 N. W. 351, after deciding the case upon other grounds, and apparently without any claim of the sort having been made by the prevailing party, it was said, substantially, that where a person has been wrongfully ousted from an office he cannot wait for redress till the place is filled again and then use the remedy by *mandamus* to regain possession,— not citing the early case in this state, which did not recognize any exception, nor any other Wisconsin decision. The for-

eign authorities cited, upon examination at this time, are not satisfactory, from an original standpoint, and certainly not in view of the early case here.   The only one which treats of the subject so as to challenge attention, is *People ex rel. Wren v. Goetting,* 133 N. Y. 569, 30 N. E. 968, and that only goes to the length of holding that, where the office has been filled and the right to regain possession turns. on some difficult question of statutory construction, the trial court, exercising the measure of discretion which it might, properly, in such a case, may deny the *mandamus* remedy.

In other jurisdictions *mandamus,* regardless of whether intricate questions are involved, has been said to be the more appropriate remedy for a wrongfully ousted officer to use for repossession.   As for example, *Lewis v. Whittle,* 77 Va. 415. There the court said:

"Wherever there is a right to execute an office, perform a service, or exercise a franchise, more especially if it is a matter of public concern, and a person is dispossessed of such right and has no other specific adequate remedy, then the court ought to assist by *mandamus* upon reasons of justice, as expressed by the writ, and upon reasons of public policy, to preserve the peace, good order and good government. . . . Whatever may be the rule elsewhere, it may be safely laid down as the doctrine of this court that *mandamus* is the true specific remedy for a wrongful deprivation of an office."

Continuing, in effect, where a person has been wrongfully ousted from his office and another installed therein the former is entitled to an adequate remedy for redress.   The public is likewise interested and, in such circumstances, a remedy which merely decides the right but does not restore possession is not an adequate remedy:

"If, as suggested, *quo warranto* should be adopted, and the petitioners should succeed there, they would not thereby be put in possession of what they seek, but might still be put to the necessity of *mandamus* for relief.   They might succeed

by *quo warranto* in removing their adversaries from the office, and yet need the *mandamus* to, put them in possession."

A full and adequate remedy is needed to cover both and the party should have the benefit of it if he asks for it.

Many other authorities might be cited to the same effect as the foregoing. We will refer to but a few. In *Ex parte Wiley,* 54 Ala. 226, the court remarked:

"While the current of authority does not recognize *mandamus* as an appropriate remedy to test a disputed title to a public office, or in the first instance to compel the admission of a claimant, yet if the rightful officer, in the actual enjoyment of the office, is wrongfully removed, it is generally regarded as the proper remedy to compel his restoration."

In High on Extraordinary Legal Remedies (3d ed.) at sec. 67, no exception is recognized to the propriety of the use of *mandamus* to restore to office a person who has wrongfully been removed therefrom. Much authority is cited to support that view, and among them, one holding that the court should not thus interfere in case of an incumbency being *de facto.* That, the annotator remarked, is contrary to the current of authority.

It seems that the rule as here broadly stated in *State ex rel. Gill v. Watertown,* 9 Wis. 254, 258, has not been intentionally disturbed and that the practice should be regarded as settled accordingly; eliminating anything said in *Board of Ed. v. State ex rel. Reed,* 100 Wis. 455, 76 N. W. 351, to the contrary. The remedy by *mandamus,* as has been said, is the "right arm of the court." There should be freedom to use it whenever speedy justice and adequate redress seem to demand it, and when the public, in great measure, is interested, the court should be quite liberal in allowing such use. There should be no arbitrary rule of denial, except in case of occupancy of an office by one holding *de facto* against another claiming title thereto, but never having been in possession, or

regularly declared to be entitled thereto,—a case involving a square dispute as to the title between one claiming the right, though holding no *prima facie* title, as for example a certificate of election duly issued, and one in possession holding *de facto.*

It has seemed best to treat the subject of the *mandamus* remedy thus broadly, though the case might be rested on the narrow ground that no one was adversely in possession when the action was commenced, hence there was no one against whom *quo warranto* would lie, leaving *mandamus,* clearly, the only remedy for relator. However, if there would be any great impropriety in allowing such remedy in case of the office having been filled before commencement of the action, because of its involving the title as between the two, it would seem that much impropriety existed in the circumstances of this case at the time of the trial, since the right to the office between adverse claimants was involved just the same, and without the incumbent being before the court.

No good reason appears why the liberal spirit of the Code should not be extended to *mandamus* actions so as to enable any one unlawfully ousted of his office to use the strong "right arm of the court" for his speedy restoration. That broad rule will, if well understood, prevent much vexation of courts, delay of justice, and expense to litigants and the public by efforts in trial and appellate jurisdictions for recognition of exceptions having no substantial basis to rest upon and not contemplated when this court first dealt with the matter.

In so far as approval of respondent's claim for relief upon the facts appearing in the petition for the writ, is dependable upon whether the ordinance redistricting the city of Milwaukee into wards is invalid and, so, the cause for removal of relator did not exist, it must be resolved in favor of appellant, following *State ex rel. Neacy v. Milwaukee,* 150 Wis. 616, 138 N. W. 76, where the court held such ordinance to be valid.

Did the civil service law,—ch. 313 of the Laws of 1895, as

amended, particularly, by ch. 547, Laws of 1911,—confer the power exercised in removing the relator? The plan thereof is that, in general, positions and employments in the several principal departments of the civil service of a city shall be made by the respective heads of such departments, under rules established in a manner specified. The general scope is found in sec. 4 of the act and the exceptions in sec. 6. Among them is named "heads of any principal department." It is not contended that assessors are within the general class unless as subordinate officers under the tax commissioner as "head of a principal department," within the meaning of sec. 6. So it cannot be well claimed that they are specifically excepted out of such general class unless they are "heads of principal departments" instead of being subordinates under the tax commissioner.

The civil service law, in the beginning (Laws of 1895, ch. 313, sec. 4), provided that

"heads of departments shall respectively have power to remove or discharge at pleasure any person holding any subordinate office, position or employment in their respective departments;"

and the act of 1911 added:

"for cause which shall not be religious or political and shall be set forth in detail in writing and be filed within ten days with the secretary of the city service commission. But any such discharged subordinate shall be given an opportunity to make answer and his answer, when made in writing, shall be filed with the secretary of the commission."

At this point it is well to take note of the slight difference in phraseology between "heads of departments" mentioned in sec. 4 as having the power of appointment and removal and "heads of any principal department" mentioned in sec. 6 as being exempt from the civil service rules. It seems too clear to admit of fair doubt that the two terms are used synonymously. Therefore every head of a department having the

power of appointment and removal is the "head of a principal department" and is, as such, exempt from the exercise of such power by a superior.

Counsel for the relator contend that the power of removal by the tax commissioner did not exist under sec. 4, because the power of appointment was not thereby vested in him; that the city charter of Milwaukee—ch. XVIII, sec. 6 (Laws of 1885, ch. 391, sec. 3),—from before the passage of the civil service law, has provided that

"The mayor, with the concurrence of the common council, shall, on the first Monday of January in every second year, appoint an assessor for each ward in said city of Milwaukee, whose term of office shall commence on the first day of February following, who shall have been recommended to him by the tax commissioner, and who shall be a resident of the ward for which he is appointed, at the time of his appointment, and who shall continue to reside in such ward during the term for which said appointment is made:"

that such provision was not superseded by the civil service law.

It must be conceded that, if the contention as regards undisturbed integrity of the charter be sound, then the tax commissioner did not possess the power of removal when he pretended to exercise it.

The general scope of the civil service law is declared, plainly, in its title thus: "An act to regulate the civil service of cities." By the first section it was restricted to cities of the first and second class. So the design was to regulate such service in the city of Milwaukee. In general language it, manifestly, vested in the "head of each principal department" the power to appoint all his subordinates. If the assessors were such they, obviously, were not, at the same time, "heads of principal departments" and excepted from full operation of the civil service law by the terms of sec. 6.

There was no express amendment, by the civil service law,

of the city charter respecting the power of appointment of assessors. Was there an implied amendment, by lodging such power in the tax commissioner, or an express repeal of such charter provision and substitution of the civil service plan therefor, in that the two are in irreconcilable conflict and the civil service act contains a repealing clause as to "all acts and parts of acts conflicting with the provisions hereof are hereby repealed"?

It is elementary that repeals and changes of existing laws by implication are not favored. Therefore, if a later law, in its terms, conflicts with an earlier enactment, and the former will admit of a reasonable construction leaving the latter in force, that is to be adopted. *State ex rel. Milwaukee v. Milwaukee E. R. & L. Co.* 144 Wis. 386, 129 N. W. 623. When it is thus said, it is supposed to harmonize with that other elementary and dominating rule, that the purpose of construction is to give effect to the legislative intent so far as that can reasonably be read out of the language used to express it. Therefore, though words may, looking only thereat, admit of a reasonable construction, working harmony between two enactments, if such construction will clearly violate the legislative purpose, it is not adoptable under the first rule, but must be rejected under the second. So when an act, by the fair import of its terms, looking thereto alone, conflicts with a former act, a variation therefrom by construction, within the scope of the language used, which would be permissible to effect a plain legislative purpose, cannot be resorted to where the effect would be to defeat it.

It follows, assuming for now, that there is ambiguity as to whether the assessors in the city of Milwaukee are subordinates in a department headed by the tax commissioner, that the general purpose of the civil service law, if that can be plainly seen, is important.

.Without stopping to discuss at any great extent, the sub-

ject suggested, it may be safely said that, by the civil service act, the legislature intended to go as far as practicable in placing all administrative officers, below those elected by the people, in the cities dealt with, under the merit system. At that time the desirability of such a system was uppermost in the public mind, as a means of removing the mischiefs believed to exist in municipal administration. The evils to be remedied, the objects to be attained, and the general spirit of the enactment, show a studied effort to give the broadest effect thereto practicable. First there is the general reference to the entire civil service of the city. Then the section intended to place all officers thereunder except those specifically excepted in a subsequent section. That the term "subordinate officers," used at this point, was intended to include all except those specially excepted, making two classes, one mentioned in sec. 4 to be under the civil service rules and one mentioned in sec. 6 to be excepted therefrom, is put beyond all room for question by the intervening section, 5, providing that all applicants for offices in the civil service, except those mentioned in sec. 6, shall submit to the civil service rules. Sec. 6 completes the scheme by excepting certain principal officers, not including in the descriptive words, as before indicated, assessors, unless they were intended to be so by the words "heads of any principal department."

The plain purpose of the civil service law, being as indicated, in case of any uncertainty as to what intended meaning can be read therefrom, either in respect to particular words, terms, or clauses, they should be read rather favorable to the end sought to be attained, than unfavorable thereto so as to restrict the scope thereof, where there may be, reasonably, two views. In case of the purpose of a law being very manifest and construction being required to determine the expressed meaning, the import of words and clauses should be bent, so far as can be, reasonably, to effect such purpose. *Neacy v. Milwaukee Co.* 144 Wis. 210, 128 N. W. 1063.

In the foregoing it has been assumed in favor of the appellant that there is obscurity in the civil service law as to whether it was intended thereby to supersede the charter provision as regards the manner of appointing assessors and as to whether they are "heads of principal departments," and shows, it seems, that the first must be resolved in favor of appellant,—that is that the legislative purpose was to change the manner of selecting assessors if they were spoken of as subordinates. In that case a change in the charter provision must have been in the legislative mind, since the power of appointment of subordinates was unquestionably conferred upon "heads of principal departments." In such circumstances the two provisions cannot stand together and the early law must give way to the later, in harmony with the presumed legislative purpose.

Were the assessors treated as subordinates? If so, the tax commissioner was treated as the head of a principal department. It would seem that, if practical construction could ever be controlling, it should be regarded decisive in favor of the affirmative of that question. It is the established doctrine of this court that "uninterrupted practice of a government prevailing through a long series of years and the acquiescence of all departments, legislative, executive, and judicial, sometimes becomes decisive even on constitutional questions." *Dean v. Borchsenius,* 30 Wis. 236.

"The general understanding of a law and constant practice under it for so long a period by all the officers of government whose duty it has been to execute it, unquestioned by any suit brought or public or private action instituted to test or settle the construction in the courts, ought to be very strong, if not conclusive, evidence of its true meaning and application, and that they are such as it has thus received." *Scanlan v. Childs,* 33 Wis. 663, 666.

For some sixteen years prior to the commencement of this litigation, the Milwaukee charter provision respecting the selection of assessors has been supposed, by all concerned, to

have been superseded by the civil service law. That has been "the general understanding and constant practice under it . . . by all the officers of government whose duty it has been to execute it." It has been submitted to, unquestionably, by every one. The relator accepted office under it. He was appointed by the tax commissioner, according to his petition, thirteen years before the happening of the incident of which he complains. He held office during that long period under such appointment which, if valid, was subject to recall at the pleasure of the person making it. Not even was it necessary, as we have seen, prior to the amendment in 1911, for the appointing officer to assign any cause for exercising the power of recall. During all that time the tax commissioner, by general consent, has been regarded as head of a principal department under the civil service law.

Now, it is true that, if there be no reasonable ground in the civil service act for the notion that the tax commissioner is the "head of a principal department" having the assessors, his appointees, as subordinates, practical construction cannot put such meaning into it. Such construction sometimes is the most conclusive means of getting the real legislative purpose out of a law, but cannot be resorted to for the purpose of changing it, any more than any other rule of construction can be so used.

Turning now to the scope of the tax commissioner's duties, it is easily seen that there is a very legitimate basis for the meaning the administrators of the civil service law started with. Those who had to do with the enactment appreciated, probably, better than we can at this time, the evils it was intended to remedy and the required status of the tax commissioner in the general scheme respecting assessors.

The features of the Milwaukee city charter giving rise to the thought that the legislature regarded the tax commissioner as the head of a principal department, are these: One of the major subjects dealt with in the charter is that of as-

sessment and collection of taxes, ch. XVIII being specially devoted thereto. The first office therein created is that of tax commissioner. A means of filling it was specified, and the place was clothed with much dignity. A term of three years was fixed and the selection was left to the mayor, subject to confirmation by the council. The one chosen was required to file an official oath and give a large bond to secure faithful performance of his official duties. He was given power to appoint a deputy tax commissioner and provided with clerks and an office and required to keep important records,—in fact all records appertaining to the subject of assessment of property for taxation. All complaints as to mistakes, and injustice otherwise, in the administration by the assessors, were required to be filed in his office to be disposed of by the board of assessors presided over by him. Power was given to the common council to provide for assistants to the assessors to be appointed in the same manner as the regular assessors and to "enter upon their duties under the direction of the tax commissioner." In case of an assistant assessor for any ward, the tax commissioner was required to "designate the property and territory to be assessed by each." He was given "power, with the written approval of the mayor, to remove from office any assessor" for incompetency in his opinion or neglect to perform the duties of his office. All assessors were required to report their work to him and he was required to furnish to them specified information to aid in the performance of their duties. Upon receiving the completed tax rolls from the assessors, the commissioner was required to give notice of the times and places where they would be open for examination. There are other features of a persuasive character found in the charter, ch. 184, Laws of 1874, ch. 144, Laws of 1875, and ch. 391, Laws of 1885 (Compiled Charter of 1905). Moreover, by ch. 401, Laws of 1907, there is unmistakable recognition of the tax commissioner being head of a principal department. The whole framework thereof so in-

dicates.   He is there clothed with power to create from the
assessors a board of five appraisers with extraordinary duties;
also power to divide the city into assessment districts without
regard to ward lines and do, or have done under his immedi-
ate supervision, much of the work ordinarily done by assess-
ors; to assign to each assessor his particular task and they
are required "to proceed under the supervision and direction
of said tax commissioner" to perform their duties.   The com-
pleted tax rolls are treated as made under the control of the
tax commissioner.   The work of the assessors is confined, in
the main, to merely exercising their discretion as to the as-
sessable value of property.   The ordinary requirement that
an assessor shall verify his roll when completed and deposit it
with the person required by law to make out the tax roll, is
taken away and conferred upon the tax commissioner.   He is
required to make oath to all matters ordinarily covered by the
assessor's oath,—to depose that "as far as practicable each
parcel of real estate was valued by the assessor making such
valuation from actual view of such parcel," etc.

Taking the features aforesaid in the aggregate, they seem
to make a very strong case in favor of the view that, by neces-
sary implication, the tax commissioner was intended to be
dealt with as the head of a principal department,—that rules
for construction are not required to clear up any obscurity in
respect to the matter.   In any event, the major and control-
ling probabilities are in favor of the idea that the legislature
so considered at the start, and long acquiescence in such view
should be regarded as decisive; moreover, the legislative rec-
ognition of such view after prevalence thereof for twelve years
seems to leave no reasonable room for doubt as to the right of
the matter.

The trial court reached the rather illogical conclusion, it
seems, that the tax commissioner is the head of a principal
department, within the meaning of the civil service law, but
that the Milwaukee charter provision respecting the appoint-

29]	AUGUST TERM, 1912.	35.

State ex rel. Hayden v. Arnold, 151 Wis. 19.

ment of assessors was not disturbed thereby, because the assessors are themselves heads of departments,—not subordinates under the tax commissioner,—that they are not such since they are required to exercise their judgment in making the assessment without dictation from the tax commissioner,—and, therefore, relator is entitled to restoration though he was not legally appointed in the first place. The dominant feature of the law, the persuasiveness of the practical construction referred to, the manifest legislative recognition of the status of the tax commissioner and the inconsistency of *mandamusing* one into office who was never entitled thereto, must have been overlooked. If the logic of the circuit court's decision be sound, in that the power of appointment of assessors is not conferred upon the tax commissioner by the civil service law, then the result reached must be plainly wrong, as appellant's counsel claim, since, in any event, the relator has no more right to that which he seeks than a stranger. Why should the court restore a person to an office to which he was never legally appointed and in which he was little more, if anything, than a mere intruder, a person not appointed by any authority given power in that regard under any circumstances?

To be a *de facto* officer one must be in place under color of right. If the office is appointive, as said in the books, he must be in possession under authority having colorable power to make the appointment, *Kempster v. Milwaukee,* 97 Wis. 343, 72 N. W. 743; *Ex parte Strang,* 21 Ohio St. 610, 617; *Prescott v. Hayes,* 42 N. H. 56, 58; *Fitchburg R. Co. v. Grand Junction R. & D. Co.* 83 Mass. (1 Allen) 552, 557, though, probably, long acquiescence might make him an officer *de facto* upon the presumption of an appointment by lawful authority; *Auditor General v. Menominee Co.* 89 Mich. 552, 51 N. W. 483. But a person confessing himself, and found to be only, at best, an officer *de facto,* cannot have *mandamus* to obtain possession of the office. The doctrine throw-

ing a measure of protection around an officer *de facto* is for the protection of the public, not to afford such an officer any advantage in ousting some other person from the *de jure* office. *Adams v. Tator*, 42 Hun, 384, 386.

Thus counsel for appellant is logical in seeking to overturn the final conclusion below as inconsistent with the one respecting the legitimate source of an assessor's authority in a city of the first and second class, but concedes too much in assuming that the trial court's holding as to such source is sound. We confess the wisdom of counsel for respondent in rejecting the trial court's conclusion as regards the effect of the civil service law in changing the appointing power and attempt to sustain the judgment, nevertheless, upon the theory that the assessors are not subordinate officers under the tax commissioner; but, cannot agree with counsel on that, as we have indicated.

The trial court's idea that the contrary of the foregoing is supported by anything decided in *Johnson v. Milwaukee*, 147 Wis. 476, 133 N. W. 627, does not seem to be warranted. The reasoning in that case is in harmony with that here. Emphasis was given there to the words "principal department" and the fact that the law required the officers in question, as here, to perform their duties under the direction of the one held to be "head of a principal department." The idea was made prominent that there may be subordinate departments, each complete in itself, in the sense of having duties incident thereto to be performed in the discretion of the incumbent, and yet performance be under the direction of the head of a principal department of which each of the smaller ones is an integral part.

We see no escape from the conclusion that the tax commissioner of the city of Milwaukee is the head of a department contemplated by sec. 4 of the civil service law conferring power upon such to appoint subordinates and the companion power of removal, and that the assessors are subordinates

State ex rel. Hayden v. Arnold, 151 Wis. 19.

within the scope of such authority, as has been understood to be the case and must be, if relator has any standing whatever under any circumstances, as he refers to such source for his official status.

The point is made that the ground assigned for the removal of the relator did not constitute "cause" within the meaning of the civil service law. It is considered otherwise. The law did not contemplate there being two assessors in the same district. It, especially the act of 1907 (ch. 401), rather repels the idea of any such divided responsibility, or opportunity for clash of authority, or necessity for the tax commissioner to deal with such a situation to prevent a clash. A pretty plain case existed of necessity for recall of one of the assessors, since the new division of the city into wards left two of such officers in the particular ward, each claiming to be an assessor of such ward. However, whether the cause was a good one or whether it existed, was not a matter to be settled by a *mandamus* action, as said in *State ex rel. Bannen v. Arnold, post,* p. 38, 138 N. W. 85. The relator accepted office under the law which reserved the right to remove him for "cause," affording him opportunity to answer and raise the question of whether the assigned cause existed or not and whether it was a real cause within legislative contemplation. His remedy was under the act creating the system by favor of which he held office.

*By the Court.*—The order appealed from is reversed, and cause remanded with directions to dismiss the proceedings with costs.