COINTE, Appellant, vs. CONGREGATION OF ST. JOHN THE BAPTIST, Respondent.

*September 16—October 7, 1913.*

(1–3) *Trial: Findings of fact: Ultimate facts.* (4, 5) *Corporations: Religious societies: Contracts: Estoppel: Ratification.*

1. The facts found by him which, under sec. 2863, Stats., the trial judge is required to state in his decision, are the *ultimate facts*, not merely evidentiary facts.
2. The ultimate facts which should be so stated are, generally speaking, the issuable facts which a pleading should contain. They are the facts upon which the plaintiff's right of recovery or the defendant's right to defeat a recovery *necessarily* depends.
3. The statement of an ultimate fact frequently includes a legal conclusion from the evidentiary facts.
4. By direction of the pastor of the congregation, plaintiff drilled a well upon land owned by the defendant religious corporation (organized under secs. 2001—10 to 2001—17, Stats.). The directors of the corporation never authorized or contracted for the work as required by the statute, nor was there any holding out to the public that the pastor was the agent of the corporation authorized to transact such business or make such contracts. Plaintiff did not rely upon any apparent authority of the pastor. He knew that the directors only could act in the matter and that they had not done so, but proceeded with the work relying only upon the influence of the pastor and bishop to secure his pay. *Held*, that there was no estoppel rendering the contract binding upon the corporation.
5. No ratification of such contract resulted from the fact that the well, after being completed, was by the pastor's direction connected with the water pipes in the parish buildings and the water used thereafter.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed.*

This is an action to recover the reasonable value of the drilling and construction of a well upon the real estate belonging to the defendant. The defendant alleges that no contract was ever made by it for the construction of the well,

and that it has never bound itself to pay for the same, either by ratification or estoppel. The action was tried by the court, and Judge HASTINGS filed the following opinion:

"The defendant is a corporation, organized and existing under and by virtue of the provisions of secs. 2001—10 to 2001—17, Wis. Statutes. It owns a church edifice, parsonage, and school building. It has five directors; the bishop, the vicar-general of the diocese, and the pastor of the congregation are *ex officio* directors; the other two are chosen from and by the congregation. The bishop is president, the pastor vice-president *ex officio*. The secretary and treasurer are chosen from the laymen as provided by by-laws.

"The bishop, vicar-general, pastor, treasurer, and secretary are *ex officio* directors. The title to the property of the congregation is vested in the corporation which has control of the temporal affairs of the church. The directors are its governing body.

"In 1905 Father Volbrecht was the pastor of the congregation. There was on the premises a flowing artesian well which forced water through the parsonage in pipes. In October, 1905, there was some trouble with the flow of the water; plumbers were called who failed to remedy the difficulty, and the pastor called upon the plaintiff, a well-digger by occupation, to attempt to repair the well. After working at it for some time the plaintiff advised the pastor that he found the old well so defectively packed that he could not remedy the defect and overcome the difficulty in getting water, and advised the necessity of drilling a new well. He informed the pastor of the terms on which he would drill a new well, naming the price per foot, he furnishing all materials, viz.: $1.50 per foot; specified the size and kind of packing.

"There were a number of wells near by, the known depth of which was, one 160 feet, one about 200 feet, and one about 300 feet. For the price named the plaintiff was to furnish a flowing well with satisfactory flow. The pastor informed the plaintiff that he would see the directors (superiors) and see or decide what to do about it. Three or four days later the pastor told the plaintiff to go on and drill the well. The plaintiff had used in attempting to repair the

old well a small machine. He took to the premises the fol-
lowing Monday a larger machine about fifty feet in height,
and on Tuesday morning his son with two other men com-
menced work on the new well, the plaintiff being at work on
another well in another part of the county. On Friday af-
ternoon Champeau, one of the trustees, went to the plaintiff's
son and told him to stop the work. The son telephoned the
plaintiff the same evening. The plaintiff understood that
Champeau was a director. He asked his son whether more
than one trustee had ordered him to stop. Told him to stop
if two trustees ordered him to do so; that he would be there
on Sunday to see about it and to continue work Saturday if
the pastor so advised and to see him.

"The plaintiff went to Duck Creek, where the church is
located, on Sunday; met Champeau and Ulmer, the two di-
rectors. They both told him to stop work on the well.
There was to be a confirmation by the bishop at the church
the following Tuesday, which the plaintiff knew. There is
no evidence that plaintiff was informed that there would be
a meeting of the trustees or directors while the bishop would
be there, but the plaintiff assumed that the bishop would
have something to say about such matters in case of dispute
between the local authorities, and he told the two trustees
that he would do no work that week; that the bishop would
be there on Tuesday and they could settle the matter, and if
they then wanted him to quit, to give him notice to that ef-
fect and he would do so. After church he told the pastor
what he had done. On the following Saturday the plaintiff
asked the pastor over the telephone how the matter stood, and
the pastor told him that they had decided to go on and drill
the well. On Monday morning the plaintiff went to the resi-
dence of the bishop in Green Bay for the purpose of learning
from the bishop what action had been taken relative to the
matter while the bishop was at Duck Creek the week before.
He did not see the bishop, but saw the vicar-general, to whom
he made known his errand, and was informed by him that
they had decided to build the well and was told by him to go
on and build it.

"The plaintiff was told and supposed that the vicar-gen-
eral had been at Duck Creek on the previous Tuesday with
the bishop. It does not appear whether the vicar-general

had been there.   The plaintiff received no notice from any one, after the Sunday that he was at Duck Creek and met Champeau and Ulmer, not to go on with the work.   The day after he was told by the vicar-general to go on with the work he resumed the work, and completed it about January 20th. The character of the work and the machinery used in it was such as to give notice to those attending the church or living in the vicinity that the work was going on.   The plaintiff knew that there was opposition to the new well on the part of members of the congregation, and when he resumed work he was told by a resident of Duck Creek that he would have trouble to get his pay.   While the work was still going on, but when about finished, he was informed that the opposition to the well had been a subject of rebuke by the pastor to the congregation from the altar and that the pastor had said to the people 'you pay your dues and I will see that the well is paid for.'

"To a party who told him that on account of the feeling of the congregation he did not think the plaintiff would get his pay, he replied that he had been to see the bishop about it and that the bishop and the pastor were good for it.   After the work was completed, but it does not appear what time, the plaintiff was informed that the pastor had told the congregation from the altar that 'if they did not pay for the well he would.'

"When the well was completed the plaintiff asked the pastor who would measure it, and the pastor replied that he was capable of doing that.   They agreed upon the number of feet and the pastor ordered it connected with the piping in the parsonage, school, and sisters' house.   The well is such in all respects as the plaintiff agreed to furnish.   No fault has ever been found with it as a well; the objection being to any well at all, the opposition claiming that the old one was sufficient.   The plaintiff never made any effort to have the well accepted by any one except the pastor.   He made out two bills against the defendant, one for the work on the old well, one for the new well, and the pastor O. K.'d them as correct on January 24, 1906.   The pastor told the plaintiff at the time that he would have to wait for his pay, but to take the bills to the bishop and show them to him.

"The plaintiff went to the bishop's residence for the purpose of showing him the bills.   He did not see the bishop, but

showed the bills to the vicar-general and was informed by him that it was all right. He did not tell the vicar-general of any opposition to the well. The plaintiff did and heard nothing more about the matter until May, 1906, when he went to Mr. Pohls, the defendant's treasurer, also a director, showed him the bills and left with him copies. He did not say anything to Pohls about the opposition to the well. Pohls did not say or intimate that there was any defense to the claim or that there would be any. He did say to the plaintiff that there was a hard feeling against that well, the farmers did not have much money then, and if taxed to pay for the well they would kick. They would have money in the fall and the plaintiff would get his pay then. Pohls said that they would have to repair the church steeple and borrow money for that, and that they might get enough for both.

"In July, 1906, Father Diss became pastor of the church and remained there as such until September, 1907. While Father Diss was there, the exact time does not appear, the plaintiff went to him with his claim and wanted him to try to make a settlement. Father Diss told the plaintiff that personally he would like to pay him, but he had no authority and told him that he should come when there was a meeting of the board. Father Duffy succeeded Father Diss as pastor.

"It does not appear that the plaintiff did anything further about his claim until the fall of 1908. He then went to the bishop's residence to see him about it. He did not see him, but saw his private secretary, Father Marx. He informed Father Marx of his errand and showed him copies of his bills, but not those with the O. K. Father Marx told plaintiff that he would make an appointment for him with the bishop. Father Marx showed plaintiff that the bishop had left the matter with him, and the plaintiff took to and left with Father Marx the two bills with the O. K. on to show to the bishop. A few days later Father Marx returned the bills to the plaintiff with a letter as follows:

"'Oct. 22, 1908.

" 'Dear Sir: Inclosed are your bills. Bishop Fox will call in Father Duffy and matters will be settled as soon as possible.                 Resp.                 Jos. A. Marx.'

"The next that plaintiff heard from the matter was a letter from Father Marx, received about the time of its date, which was as follows:

" 'October 30, 1908.

" 'Dear Sir: The Duck Creek parish assumed the debt and promised to pay your bill. As the bill is large they will pay it in sections. Hope this is satisfactory.

" 'Respectfully yours,     Jos. A. MARX.'

"Father Marx as a witness tells us that the letters are his, but he does not recall writing them. He has no recollection of writing the last one, and don't think that the bishop directed him to write it. His reason for thinking so is that he thinks that he would have so stated in the letter had he been directed. He remembers that he spoke to the bishop after the plaintiff showed him the O. K.'d bills and before he wrote the first letter. He don't recollect that Father Duffy was called in between the dates of the two letters. He is sure that he would not state anything in the letters that was not true.

"Just what occurred between the time the plaintiff left his bills with Father Marx and the date of the last letter we do not positively know, but the only legitimate conclusion from the evidence and lack of evidence is, that the first letter was written because of what the bishop told the writer when he spoke to him about them after the plaintiff had left the bills with him. There can be no doubt that Bishop Fox did tell Father Marx that he would call in Father Duffy, but it is not a necessary inference that the bishop directed his secretary to say to the plaintiff that the matter would be settled. That may have been the secretary's own statement and conclusion, as there is nothing showing that he knew of any objection to the bill. I think that the letter of October 30th in connection with the other evidence makes it clear that after October 22d there was some communication between the bishop or some one representing the defendant which came to Father Marx's knowledge and in such way that he felt it his duty, because of what he had stated in his first letter, to communicate the result to the plaintiff, and that he stated the fact as he learned and understood it.

"Father Marx does not deny that he told Cointe that the matter was referred to him, or the fact that it was referred

to him, but simply that it was referred to him to say whether it should be paid or not, and the language of his last letter may be explained, not saying that he was directed by the bishop to say, by the fact that he investigated the matter, saw Father Duffy or some one else representing the defendant, and was informed that the bill would be paid in sections. He does not say that Father Duffy was not called in; he simply does not recall the facts. After receiving these letters from Father Marx the plaintiff tried to make an appointment with Father Duffy, but failed to do so owing to Father Duffy's being liable to be called away at any time.

"In the fore part of February, 1909, the plaintiff saw the bishop about this matter. The bishop told him that he would have a meeting with him and see about it; that plaintiff had waited long and he would have it settled within a couple of weeks. After waiting a month the plaintiff wrote the bishop inquiring about the matter, and the same day received a postal card from Father Marx, in response to which he called on the bishop, who remarked that the letter and postal card had crossed in the mails. The bishop told the plaintiff that he had had a meeting with 'them' on Friday; that they thought the amount was large, a good deal of money; that there was kicking about the pipe, but they had instructed him to pay $500. The bishop did not say that defendant denied liability. The plaintiff refused to accept the $500 in payment of his claim and commenced this action.

"At no time prior to answering in this action did any one connected with defendant deny its liability to the plaintiff on his claim.

"On July 21, 1906, the plaintiff filed his petition for a lien upon defendant's property for his bill, and intended to keep his lien alive by an action, but by some neglect of his or the attorney who then represented him he neglected to commence the action within a year from the completion of the work.

"Water continues to flow in considerable quantity from the old well.

"It clearly appears from the foregoing that the well is valuable to the defendant, that it recognizes it as such, and that the bishop and other officials so recognize it, and a moral

obligation to pay the plaintiff for it; something, if not the full amount claimed.

"But the question is, Is there a legal liability which the plaintiff can enforce? That the pastor had no authority to contract for the work so as to bind the defendant is clear. The authority to bind the corporation by contract is vested in the directors. They may, *by a majority vote,* contract debts not exceeding in amount the sum of *three hundred* dollars, but debts in excess of that sum may be contracted by the consent and *vote* of *all the directors.* Sec. 2001—14, Stats.

"The plaintiff has failed to show any action by a majority of the directors authorizing the pastor to contract for the well, or any action by the directors as a body.

"The only theory upon which it is claimed that a contract was made by him binding upon the defendant is that of estoppel.

"Officers are agents for their corporations, and they cannot bind them by contract which they have no authority to make, any more than agents of natural persons can bind their principals without authority. But the same rule applies to business corporations as to natural persons. They are estopped as to innocent parties from denying the apparent authority of their officers. But this rule has no application where the limitation upon the officers' authority is known or the party has notice of it.

"The defendant is not a business corporation organized with authority to or engaged in any line of business, with officers clothed with apparent authority of general managers. Corporations organized under secs. 2001—10 to 2001—17 are business corporations only for the purpose of attending ·to the property and business affairs of church, parsonage, and school edifices. There is no evidence showing that any officer of this or such corporation ever exercised the authority to make such contract as the one in question. But should we concede that such corporation stood on exactly the same footing as purely business corporations, in which as a rule the president and secretary exercise all the powers of a general manager, the corporation is not estopped from denying the authority of an officer to make a contract which he was not authorized to make, when the party dealing with it has knowledge or notice of the fact.

"The law is well stated by Mr. Justice MARSHALL, 115 Wis. 583, 92 N. W. 234: 'A person who finds the president of a corporation apparently in charge of its *business* or assuming to have the right to act as its *general* agent, *there being nothing to put him on guard to the contrary,* may freely and safely deal with such officer *in respect to the ordinary business of the corporation,* business which by common usage is managed in that way on the assumption that the officer possesses the power of a general agent.'

"It clearly appears from the evidence in this case that the plaintiff did not rely upon any apparent authority in the pastor to contract for the corporation for this well, but he knew that only the directors could act. When he submitted his proposition to the pastor, he was told that he, the pastor, would see the directors about it. So soon as the work commenced he was ordered by a director to stop. He came and consulted two of the directors and suspended work until they could have a meeting and act upon the matter, expecting that the meeting would be held in a few days. He waited for the result of the meeting, never once relying upon any supposed or apparent authority in the pastor to contract for the work without being authorized by the directors to do so. He does not claim to have proceeded with the work relying upon anything but his understanding that the directors had authorized it. Having knowledge or notice that authority from the directors was necessary to authorize an officer to make the contract, he cannot hold the corporation estopped from denying the officer's authority.

"The burden is upon him to show that the corporation (the directors) authorized the contract. There is no competent evidence in the case showing any action by the directors. If the statements of the pastor and vicar-general testified to by *Cointe* were competent evidence, they might sufficiently show action by the board; but they are mere hearsay as testimony and not admissions made in line of official duty.

"Plaintiff's counsel admitted that *he* had no evidence showing that the directors ever met and authorized the pastor to contract for the well, when defendant's counsel started to prove that they never did. I do not think that the plaintiff has shown any contract for the well binding upon the defendant.

"I think that the fair inference from the testimony as a whole is that the people of the congregation were opposed to the well; did not think that it was necessary, thinking the one then sufficient; that the lay directors would not authorize it; that the pastor was determined to have it and ordered it without the authority of the board, relying upon his ability to make the people pay for it, and that the plaintiff proceeded with the work relying upon the influence or authority of the pastor and bishop to secure his pay.

"I find nothing in the evidence showing that the corporation by any action accepted the work and ratified the contract. The statements made by Father Marx and Bishop Fox are but hearsay, if they amount to statements as to what action the defendant took. The statement that the bishop was authorized to pay for defendant $500 would show, if anything, an offer to compromise.

"The plaintiff never having had a valid contract with defendant for digging the well, and the corporation never having by any action of its board ratified the act of the pastor or accepted and agreed to pay for the well, counsel contends that the law will not allow it to keep the well and not pay for it. He claims that the case falls within the rule asserted in *Thomson v. Elton,* 109 Wis. 589, 85 N. W. 425, stated as follows in the syllabus:

" 'Where the officers of a town, assuming to act in its behalf and *having the appearance of* authority, borrowed money, representing that it was to be used for lawful town purposes, and it was so used, and the lender acted in good faith, the law implied a promise to return the money, upon which an action for money had and received will lie.

" 'The doctrine of *ultra vires* cannot be invoked by a municipal corporation, in the absence of some prohibitory law, to protect itself from liability to refund money which it has received and of which it has had the legitimate benefit, when the individual dealing with the corporation has parted with his money believing that the corporation had a lawful right to acquire it.'

"In the opinion Mr. Justice MARSHALL says: 'The principle of those cases is that municipalities are bound by moral obligations, *as well as individuals,* and that where, *in case of the latter,* such an obligation will give rise to a legal

liability, it may have the same effect as to a municipality.' Referring to an earlier case he says: 'The implied promise . . . arose from the fact that the city, having possession of the money to which it had no legal right, used the same for lawful municipal purposes.'

"The court in stating this rule says that it is the same that would apply in case of an individual, 'when in case of an individual such an obligation would arise.' It arises in case of a municipal corporation. There would seem to be no reason why the rule should not also apply to a private corporation.

"Had there been a mortgage on the church property or a valid mechanic's lien, and the pastor without authority had borrowed money and paid off the incumbrance, the party loaning it in good faith and reliance upon the pastor's authority could, within the principle of the cases, have recovered it; certainly if the directors had authorized the payment or ratified it. But had he borrowed money and used it in making improvements upon the parsonage or church that the directors did not approve of or authorize, there certainly would be no implied promise by the corporation to repay the money, and the fact that the pastor and subsequent pastor continued to use the property with the improvements would not raise an implied promise to repay the money; and I do not think that any implied promise arises from the fact that the congregation, corporation, continued to use the improvements that the pastor put upon the premises without authority from the congregation.

"Suppose that he had the parsonage painted and expensively decorated or had expensive improvements by way of fitting with gas or electric lights. To bring this case within the principle invoked the corporation must have authorized the improvement or it must be something that it can tender back to the party putting it in and which can be taken away without expense to the corporation or detriment to its property.

"I do not think that the defendant ever became legally liable to pay the plaintiff for said well, and the plaintiff is not entitled to recover anything on his second cause of action.

"Findings and judgment may be drawn in accordance with the foregoing conclusions."

In accordance with the direction at the foot of the opinion, it appears that one of the plaintiff's attorneys drew so-called findings, which consisted principally of a verbatim copy of a large part of the foregoing opinion, and closed with conclusions of law to the effect that there was no valid contract for the well originally made and that the evidence showed neither ratification nor estoppel on the part of the defendant. From judgment in accordance with the findings the plaintiff appeals.

For the appellant there were briefs by *Greene, Fairchild, North, Parker & McGillan,* and oral argument by *J. R. North.*

For the respondent there was a brief by *Martin, Martin & Martin,* and oral argument by *P. H. Martin.*

WINSLOW, C. J. The opinion filed by the circuit judge is a very careful and comprehensive discussion of the facts shown by the evidence and of the law applicable to those facts. It has been of the greatest assistance to us in our consideration of the case, and we have inserted it in full in the statement of the case partly on that account. This, however, is not the only reason for setting it forth in full.

As has been said in the statement of the case, the findings of fact consist principally of a copy of the opinion. Considered as an opinion, the document is admirable and is really all that an opinion should be; considered as a response to the statutory requirement that the trial judge should state in his decision "the facts found by him" (sec. 2863, Stats.), it is all that such a response should not be. We say this the more readily because it was stated by appellant's counsel on the argument that the so-called findings were drawn by one of their number and presented to Judge HASTINGS for signature. We have entire confidence that the counsel who drew them and the circuit judge who signed them will accept the criticism

now made in the kindly spirit in which we shall endeavor to make it.

Whether the findings are drawn by the circuit judge personally or drawn by counsel at his direction and submitted to him for approval and signature, they should never consist of detailed recitation of merely evidentiary facts. The facts referred to in the statute are the "ultimate" facts, *i. e.* the facts upon which the plaintiff's right of recovery or the defendant's right to defeat a recovery *necessarily* depends. The difference between the two kinds of facts may perhaps best be shown by an illustration. In a personal injury action by employee against employer, the evidence may tend to show that the place in which plaintiff worked was dark, that the floor was rough or insecure, that there was a concealed trap door with insufficient hinges or a rotten barrier, and numerous other facts. These facts are all evidentiary. The ultimate fact is that the employee was furnished an unsafe place to work. If such an action were tried by the court, the findings of fact should not contain a recitation of what this witness or that witness testified as to the darkness or the imperfect floor or the concealed trap door, but should contain a finding of the ultimate facts, namely, that the place was an unsafe place to work, by reason of the fact that it was dark, or the floor rough, or otherwise. So in the present case the ultimate facts in issue were few and simple, namely: (1) Did the board of directors of the defendant corporation, either by majority vote or by unanimous vote of all, contract with the plaintiff for the construction of the well? (2) If not, had the corporation, by the course of its business in the past, held out to the public that the pastor and bishop were its agents in the transaction of business, and authorized to make contracts of this nature on its behalf? (3) If not, then had the corporation accepted and made such beneficial use of the well that it has ratified the unauthorized acts of its officers in causing it to

be dug.   The answers to these questions are the final in-
ferences of fact which are to be drawn from and are the logi-
cal result of the subordinate or merely evidentiary facts.
*Caywood v. Farell,* 175 Ill. 480, 51 N. E. 775; *Kahn v.
Central S. Co.* 9 Utah, 371.   They are none the less propo-
sitions of fact because they involve a legal proposition.
*Meyer v. SchoolDist.* 4 S. Dak. 420, 57 N. W. 68.

The *ultimate* facts which a finding should contain are, gen-
erally speaking, the *issuable* facts which a pleading should
contain (sec. 2646, Stats.), and practically the same as the
facts which a special verdict should contain (secs. 2857, 2858,
Stats.).   In either case the statement of the ultimate fact fre-
quently includes a legal conclusion from evidentiary facts,
and in either case it should, generally speaking, be such a
fact that, if it were to be successfully denied, the conclusion
of liability or nonliability based upon the findings as a whole
is untenable.   Bliss, Code Pl. (3d ed.) § 206; *Calumet S.
Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131. .

In the present case two or three typewritten pages would
have sufficed to state the ultimate facts fully and completely,
whereas ten printed pages have been so used.   We are moved
to make these criticisms not so much from any serious diffi-
culty presented in the present case as from the fact that a
number of cases have been presented to us recently where
the findings have consisted of many pages of merely evi-
dentiary facts, sometimes leaving grave doubt as to what ul-
timate facts the court really determined, thus entailing upon
us much tedious and unnecessary labor.   It would help us
much if the trial judges, who under the statutes are respon-
sible for the findings of fact, whether they personally draw
them or not, would see to it in every case that their findings
be confined to the ultimate facts as defined or attempted to
be defined in this opinion.

Our only serious difficulty in the present case has resulted
from the fact that while the findings of fact are substantially

a copy of the opinion so far as they go, they stop abruptly at the beginning of the sentence, "But the question is, Is there a legal liability which the plaintiff can enforce?" At this point the so-called findings of fact cease, and the conclusions of law to the effect that there was no valid contract, no ratification, and no estoppel at once follow. The reason why the balance of the opinion was not incorporated in the findings is not clear, unless it was thought that it consisted entirely of a discussion of the law. This, however, is not the fact, for it contains in addition to the legal propositions some very important propositions of fact, namely, the propositions that the plaintiff knew that it was necessary that all the directors should authorize the digging of the well, knew that they had not done so, did not rely upon any apparent authority in the pastor to make the contract, and proceeded with the work relying only on the influence and authority of the pastor and bishop to secure his pay. If the circuit judge omitted these propositions or sanctioned their omission because he had become satisfied that they were not sustained by the evidence, the question presented as to what his conclusion really was on the issue of estoppel might be doubtful. On consideration of the conclusions of law, however, it seems that this could hardly be the case, and we are convinced from the whole record that the conclusions of fact on this subject expressed by him in his opinion remained his conclusions of fact when he signed the findings. In fact it is difficult to see how on any other basis he could have reached the conclusion of law that there was no estoppel.

So far as the so-called findings contain findings of ultimate or evidentiary facts, they seem to us to be sustained by the evidence, and on the whole we think they fairly sustain the conclusions of law. The fact that there was no contract made in the manner required by statute is not seriously disputed. The fact that there was no holding out to the public that the pastor or bishop, or both, were the general agents of

the corporation, authorized to transact such business and make such contracts, seems hardly open to question under the evidence. The conclusion that there was no ratification resulting from the fact that the well was, by the pastor's direction, connected with the water pipes of the three parish buildings and the water used thereafter, is amply justified by the principles laid down in the case of *Manitowoc S. B. Works v. Manitowoc G. Co.* 120 Wis. 1, 97 N. W. 515.

*By the Court.*—Judgment affirmed.